232 F.3d 1271 (9th Cir. 2000)
 PERRY E. COLEMAN; BARBARA J. COLEMAN, husband and wife, Plaintiffs-Appellants,
v.
THE QUAKER OATS COMPANY, a New Jersey corporation, Defendant-Appellee.
JERRY JENEY; PEGGY JENEY, husband and wife, Plaintiffs-Appellants,
v.
THE QUAKER OATS COMPANY, a New Jersey corporation, Defendant-Appellee.
PERRY E. COLEMAN; BARBARA J. COLEMAN; JOHN RUSSELL; JERRY JENEY; DENIS SCHWEITZER, a divorced man; JOHN TALLARITI; KENNETH NERO; GARY PEEPLES; J. THOMAS CHRISTENSON; SHARON RUSSELL; PEGGY JENEY; TERRINE TALLARITI; KATHLEEN FLAMM NERO; JAN MARIE IMMKER PEEPLES; KAYE CHRISTENSON; CAROL COLLINS, a single person, Plaintiffs,
and
JOSEPH GENTILE; LORRAINE GENTILE, husband and wife, Plaintiffs-Appellants,
v.
THE QUAKER OATS COMPANY, a New Jersey corporation, Defendant-Appellee.
 No. 99-15885 No. 99-15886 No. 99-15887
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted February 17, 2000
Filed November 20, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Arthur Pederson (argued) and Karen Karr, Mohr, Hackett, Pederson, Blakley & Randolph, P.C., Phoenix, Arizona, and James Hill, Phoenix, Arizona, for the plaintiffs-appellants.
 Martin Harris (argued), Connelly Sheehan Moran, Chicago, Illinois, and Antonio Dominguez, Dominguez & Associates, P.C., Phoenix, Arizona, for the defendant-appellee.
 Appeals from the United States District Court for the District of Arizona Robert C. Broomfield, District Judge, Presiding. D.C. No. CV-96-0828-PHX-RCB. D.C. No. CV-96-0822-PHX-RCB. D.C. No. CV-95-1516-PHX-RCB
 Before: Betty B. Fletcher, William C. Canby, Jr., and Diarmuid F. O'Scannlain, Circuit Judges.
 Opinion by Judge O'Scannlain; Dissent by Judge B. Fletcher
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must decide whether former employees have raised a genuine issue of material fact as to whether they were illegally fired because of age.
 
 
 2
 * A
 
 
 3
 Jerry Jeney ("Jeney"), Joseph Gentile ("Gentile") and Perry Coleman ("Coleman"), along with hundreds of other employees nationwide, were laid off by the Quaker Oats Company ("Quaker") in Arizona during a series of reductions-in-force ("RIFs") from 1994 to 1995.
 
 
 4
 * Jeney, a 55-year-old white male,[1] began working for Quaker in 1987 after it had purchased the company at which Jeney was employed. At Quaker, Jeney worked for six years as a sales representative, a position equivalent to that which he had held at other companies since 1969. Jeney's responsibilities involved visiting supermarkets to rotate products, to arrange displays, to ensure adequate stocks, and to check if the supermarkets displayed all the company's products they were supposed to carry.
 
 
 5
 In 1993, a RIF threatened Jeney's job. Impressed with Jeney's skills, Ken Willis, a Quaker supervisor, created a new position for him--Area Retail Manager ("ARM"). Jeney was the only ARM in the Quaker organization nationwide and in this position assisted individuals with various accounts. Jeney's previous responsibilities as sales representative had been outsourced to independent food brokers. His new position required him to inspect and to grade the performance of the outside brokers and to prepare diagrams showing how toarrange products on the shelves. Jeney held this job until the 1994 RIF.
 
 
 6
 In 1994, Quaker implemented a nationwide business reorganization which eliminated almost all lower level sales positions. Quaker laid off 300 employees, including Jeney. The work of these employees was farmed out to outside brokers. This 50 percent reduction in workforce added high-paying jobs as it cut most low-ranking jobs. In order to select the employees who would remain, Quaker sent a human resources team to rate employees in several categories. Most of these categories emphasized skills developed through headquarters (management) work.
 
 
 7
 The ranking evaluated employees in six categories: strategic business planning, advanced fact-based selling, category expertise, customer operations understanding, leadership ability, and communications skills. All employees were also evaluated on their learning agility and versatility. Jeney received poor scores in those categories representing headquarters skills with which Jeney had no experience: strategic business planning, advance fact-based selling, and category expertise. He received average scores in the remaining categories. Jeney also received an average score in "Learning agility," defined as one's ability to learn from past mistakes. In "Versatility," Jeney received a rating of well-placed, meaning that he was good at his current job, but not likely to advance. Overall he received a grade of "B." During this process, Quaker monitored the RIF to ensure that it did not have an adverse effect on race or gender diversity in the company. No action was ever taken because no such effect was identified.
 
 
 8
 Positions at Quaker are ranked by "hay points. " A one-level promotion entails an increase of 100 hay points. Jeney's position as an ARM was 366 hay points. His previous position as a sales representative represented 301 hay points. Following the evaluation process, Quaker had to fill six positions in the Phoenix, Arizona area where Jeney worked. Ken Willis, the same employee who had created the ARM position specially for Jeney the previous year, did not select him to fill any of these job openings.
 
 
 9
 The first four job openings were for account executives, positions ranked at 636 or 732 hay points. The fifth position was a broker field manager at 732 hay points. The final opening was for a customer manager, a position with 438 hay points, much closer to Jeney's then current level of 366. All candidates selected for the account executive positions had previously held comparable positions with 732 hay points. Three had received an A rating and the fourth a B+ rating. The fourth individual also had years of headquarters experience. The candidate chosen to fill the high-level broker field manager position (732 hay points) had received a B+ rating and had managed brokers previously. Finally, Willis chose Bob Dumais (a forty-year-old white male) for the Customer Manager position. Dumais had received a B+ rating and had headquarters experience. All six individuals chosen for these positions were white, five were men, and three were forty or older.
 
 
 10
 Several of these employees, however, chose to leave the company. One of the account executives resigned. He was replaced by a candidate who had received an A rating, but who also resigned within a month. His replacement was Bryan Hardman, a customer manager from Los Angeles who had received an A rating. In November 1994, when another account executive resigned, he was replaced by Bob Dumais, the previous customer manager, leaving that position open.
 
 
 11
 Jeney was considered for the vacant customer manager position after his former manager recommended him for it. Quaker decided against Jeney, however, at least in part because it did not consider him to be "promotable." Instead, Rucker chose Ken Oliver (a 34-year-old white male) with a degree in marketing who was pursuing an M.B.A. in the evenings. Jeney was laid off. By the time the RIF was completed, Quaker had laid off two-thirds of its employees aged 40 and older, and one-third of those employees under age 40.
 
 2
 
 12
 Gentile, a 53-year-old white male, began working for Quaker in 1978 as a sales representative. He was later promoted to customer manager, the position he had when he was discharged in 1994. Gentile's responsibilities involved handling large supermarket accounts for both breakfast and pet foods. Although Gentile's performance had earned him various awards and positive performance reviews, particularly with regard to his relationships with the buyers, Gentile's reviews had recently worsened as his position required greater analytical responsibilities. Quaker also received a complaint about him from an independent broker.
 
 
 13
 During the 1994 RIF, Quaker evaluated Gentile using the same system employed with Jeney. Gentile received a B rating overall, garnering praise for his customer relationships, but criticism for his analytical skills. In Arizona, where Gentile worked, Quaker filled six sales positions. The first four job openings were for account executives, the fifth position was a broker field manager, and the final opening was for a customer manager. All of these jobs went to employees who had received higher ratings. All six individuals chosen for these positions were white, five were men, and three were forty or older.
 
 3
 
 14
 Coleman, a 49-year-old male, began working for Quaker in 1972. At Quaker, Coleman rose from account representative to account executive, the position he held until he was discharged. Coleman's responsibilities included preparing business planning initiatives and managing relations with assigned customers. Coleman survived the 1994 RIF that ended the careers of Jeney and Gentile. In fact, at that time Quaker promoted Coleman from customer manager to account executive.
 
 
 15
 Then, in 1995, Quaker sold its pet foods business and undertook another, smaller RIF, eliminating two sales positions in Phoenix. The four account executives and one customer manager were evaluated by their supervisors, Julie Forbes and Bob Blair. Coleman ranked third with 13 points, placing him in the middle of the group. Lisa Rodriguez (16 points) and Bryan Hardman (14 points) ranked above him; Bob Dumais (12 points) and Ken Oliver (11 points) ranked below him. On the basis of these rankings, Quaker decided to terminate Dumais and Oliver. At this point, however, Forbes, Dumais' supervisor, intervened. She argued that the difference between Coleman and Dumais was only 1 point and resulted from the fact that she was a tougher evaluator than Coleman's supervisor, Blair. Blair and Forbes sparred over whose employee would be kept on, and Blair finally relented. Thus Quaker kept Dumais and discharged Coleman.
 
 
 16
 Finally, Quaker's national headquarters agreed to allow one more sales position in Phoenix, but only on condition that it rank below account executive in order to keep down costs. Oliver, who had scored lower than Coleman, was kept. Quaker states that it did so because the position was two levels below Coleman's level and would have meant a large pay cut for him. Fearing the loss in morale and knowing that Oliver was already working on the account assigned to that position, Quaker selected Oliver and laid off Coleman.
 
 B
 
 17
 Believing that they had been terminated because of their age, Jeney, Gentile, and Coleman filed complaints with the Equal Employment Opportunity Commission ("EEOC"). On May 27, 1998, the EEOC issued its determination that it found reasonable cause to believe Quaker had discriminated against older employees as a class and had violated the law when it terminated Jeney, Gentile, and Coleman.
 
 
 18
 In the meantime, in October 1995, Jeney, Gentile, and Coleman, together with seven other plaintiffs, filed this suit in the United States District Court for the District of Arizona. All ten plaintiffs had been fired in the RIFs and all alleged that Quaker fired them because of their age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. S 621 et seq. Their complaints also included state law claims for breach of contract and discharge in violation of public policy. Quaker moved to sever the cases. The district court granted Quaker's motion on April 8, 1996, ruling that trying the cases together could cause jury confusion and prejudice Quaker. The court ordered the cases sent to the districts in which the plaintiffs had worked for Quaker. Because Jeney, Gentile, and Coleman had worked in Arizona, these cases remained there. The three cases proceeded separately but in close coordination with one another.
 
 
 19
 On November 11, 1996, Jeney and Gentile, but not Coleman, filed a second complaint with the EEOC charging discrimination on the basis of sex and race. On March 14, 1997, Jeney and Gentile filed a second amended complaint in district court alleging that they had been fired because of their race and sex in violation of Title VII of the Civil Rights Act, 42 U.S.C. S 2000e.
 
 
 20
 After a contentious discovery period, both sides moved for summary judgment. On March 10, 1999, the district court granted summary judgment in favor of Quaker on all the claims. The judge assumed Jeney, Gentile, and Coleman had made out a prima facie case of intentional age discrimination, but concluded that they had failed to raise a genuine issue of material fact as to whether Quaker's stated reasons for firing them were pretextual. In addition, the district court found that they had not timely pled age discrimination under the disparate impact theory of liability and rejected their motion to amend their complaint to add this theory.
 
 
 21
 With respect to Jeney and Gentile, the district court found that their claims of race and sex discrimination were barred by the statute of limitations and that in any case they had not raised a general issue of material fact that they had been discriminated against on these grounds. With respect to Coleman, the judge granted Quaker's motion to strike his statistical evidence because most of the analysis concerned the 1994 RIF, not the 1995 RIF in which Coleman lost his job. The judge also excluded, under Federal Rule of Evidence 408, Quaker's settlement offer made after Coleman had filed his EEOC charge.
 
 
 22
 As the state law claims rested on the same factual basis as the federal claims, the district court granted summary judgment for Quaker on Jeney's, Gentile's and Coleman's claims that they had been discharged in violation of Arizona public policy and in breach of their employment contract. In addition, the district court concluded that Quaker's Code of Ethics did not create contractual obligations under Arizona law.[2]
 
 
 23
 Jeney, Gentile and Coleman timely appealed.
 
 II
 
 24
 * The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. SS 621 et seq., makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual [who is at least 40 years of age] . . . because of such individual's age." Id. at SS 623(a), 631(a). To establish a violation of ADEA under the disparate treatment theory of liability, Jeney, Gentile, and Coleman "must first establish a prima facie case of discrimination. If [they do so], the burden then shifts to [Quaker] to articulate a legitimate nondiscriminatory reason for its employment decision. Then, in order to prevail, [they] must demonstrate that [Quaker's] alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). Despite the burden shifting, the ultimate burden of proof remains always on the former employees to show that Quaker intentionally discriminated because of their age. See Rose v. Wells Fargo & Co., 902 F.2d 1417, 1420-21 (9th Cir. 1990).
 
 
 25
 To establish a prima facie case using circumstantial evidence, the employees must demonstrate that they were (1) members of the protected class (at least age 40); (2) performing their jobs satisfactorily; (3) discharged; and (4) replaced by substantially younger employees with equal or inferior qualifications. Nidds v. Schindler Elevator Co. , 113 F.3d 912, 917 (9th Cir. 1997). In Coleman's case, Quaker appears toconcede that he made a sufficient prima facie showing. In Jeney's and Gentile's cases, Quaker does not dispute that they were members of the protected class or that they were discharged. In Jeney's case, with respect to the job performance element, Quaker contends that he had performed satisfactorily in his sales positions, but was not as qualified as other employees for the new, higher-level positions that remained after the RIF. In Gentile's case, with respect to the job performance element, Quaker contends that he had performed satisfactorily in his previous position, but that his performance slipped as this position required greater analytical skill. Quaker states, however, that it did not discharge him for poor performance directly; rather it laid him off as part of the widespread RIF. For both Jeney and Gentile then, the second element of the prima facie case ties into the fourth element, i.e., whether their qualifications were equal to or better than those of the retained employees.
 
 
 26
 Where, as here, the discharge in question results from a general reduction in workforce, Jeney and Gentile need not show that they were replaced; rather they need show "through circumstantial, statistical, or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination." Rose, 902 F.2d at 1421. This inference "can be established by showing the employer had a continuing need for [their] skills and services in that [their] various duties were still being performed," Wallis , 26 F.3d at 891, or by showing "that others not in [their] protected class were treated more favorably." Washington v. Garrett, 10 F.3d 1421, 1434 (9th Cir. 1994).
 
 
 27
 To establish their prima facie case, Jeney and Gentile offer the following proof: statistical evidence showing that older workers were terminated at twice the rate of younger workers; the EEOC reasonable cause determinations in their cases; the alleged statement by Quaker officials that Jeney was not "young and promotable;" and the fact that younger, less experienced employees than they were kept. "The requisite degree of proof necessary to establish a prima facie case for Title VII and ADEA claims on summary judgment is minimal . . .." Wallis, 26 F.3d at 889.
 
 
 28
 The statistical evidence is problematic. On its face, the data shows that compared to employees under age 40, nearly twice the percentage of employees over age 40 (the protected class) were laid off. This observation, however, does not take into account any variables other than age. When the statistical expert considered other variables, such as education, the percentage of older employees in eliminated low-level jobs, and the job market, the results were far less dramatic. As the district court found, "[W]hen broken down for extensive peer analysis, his results were not even significant. " Moreover, the EEOC probable cause determinations in these cases carry little weight since they are conclusory and completely devoid of analysis. Finally, Jeney's and Gentile's subjective evaluations of their relative qualifications and Quaker's alleged use of the phrase "young and promotable" do not take them far. Never-theless, despite the weaknesses in the evidence offered by Jeney and Gentile to establish their prima facie cases, given the low threshold required, we assume, without deciding, that all three--Jeney, Gentile and Coleman--have established such a case. A prima facie case raises a rebuttable presumption that Quaker has violated ADEA.
 
 
 29
 The burden now shifts to Quaker to articulate legitimate, non-discriminatory reasons for the adverse employment action. See Wallis, 26 F.3d at 889. Quaker states that it terminated Jeney and Gentile pursuant to a general reduction in its workforce and that it did not select them for any of the remaining positions because they were not as qualified as those employees chosen. It supports its argument that Jeney and Gentile were less qualified than the selected candidates by pointing to its rating system and their work experience. With respect to Coleman, Quaker states that he ranked lower than all employees retained but one in the 1995 ratings system and that the job of that employee was saved after his supervisor fought harder than Coleman's to keep him. A RIF is a legitimate nondiscriminatory reason for laying off an employee. See Nidds, 113 F.3d at 918. Furthermore, lack of proper qualifications is such a reason. See id. Thus, Quaker has met its burden of production.
 
 
 30
 At this point in the analysis, the "presumption of unlawful discrimination `simply drops out of the picture.' " Wallis, 26 F.3d at 889 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)). To survive summary judgment, the employees must now introduce evidence sufficient to raise a genuine issue of material fact as to whether the reasons Quaker articulated are pretexts for age discrimination. They may rely on the same evidence they used to establish a prima facie case or put forth additional evidence. See Wallis, 26 F.3d at 892.
 
 
 31
 While summary judgment should be used prudently in ADEA cases involving motivation and intent, see Rose, 902 F.2d at 1420, the establishment of a prima facie case based on the minimum evidence necessary to raise a presumption of discrimination does not preclude summary judgment. See Wallis, 26 F.3d at 890-91; Lindahl v. Air France, 930 F.2d 1434, 1437 (9th Cir. 1991) ("[A] plaintiff cannot defeat summary judgment simply by making out a prima facie case."). Jeney, Gentile, and Coleman "must do more than establish a prima facie case and deny the credibility of [Quaker's] witnesses." Schuler v. Chronicle Broadcasting Co., Inc., 793 F.2d 1010, 1011 (9th Cir. 1986). "In response to[Quaker's] offer of nondiscriminatory reasons, [they] must produce `specific, substantial evidence of pretext.' " Wallis, 26 F.3d at 890 (quoting Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir. 1983)).
 
 
 32
 * In response to the reasons articulated by Quaker for laying him off, Jeney puts forth the evidence used to establish his prima facie case and asserts that the system utilized by the company to rate employees in order to decide whom to retain was purposively made subjective so as to provide a "smokescreen" for discrimination on the part of the raters. Thus in determining whether Jeney produced enough specific substantial evidence to raise a genuine question as to whether Quaker's reasons were pretextual, we consider: the statistical evidence; the EEOC determination; Quaker's alleged statement that they wanted someone "young and promotable;" his qualifications relative to those of the retained employees; and evidence regarding use of the rating system as a cover for discrimination.
 
 
 33
 As noted above, at first blush, the statistical disparity between the effect of the RIF on older and younger workers appears significant. Jeney produced evidence showing that the likelihood that this disparity would occur by chance was 3 in 100 billion. The problem, however, is that Quaker never contends that the disparity occurred by chance; just that it did not occur for discriminatory reasons. When other pertinent variables were factored in, the statistical disparity diminished and finally disappeared. To establish a prima facie case based solely on statistics, let alone raise a triable issue of fact regarding pretext, the statistics "must show a stark pattern of discrimination unexplainable on grounds other than age." Rose, 902 F.2d at 1423 (internal quotation marks omitted).
 
 
 34
 We have previously held that statistics remarkably similar to these failed to raise a triable issue of fact of intent to discriminate. In Rose, a vice president whose job had been eliminated when Wells Fargo & Company purchased Crocker National Bank brought suit against Wells Fargo alleging age discrimination. The statistical evidence he proffered to survive the bank's motion for summary judgment revealed that of individuals age 50 or over in the employee's division, 73.5 percent were terminated. In contrast, 34.1 percent of individuals in their 40s were terminated, as were only 28.2 percent of those under age 40. Likewise, Jeney's figures show that 64.4 percent of employees over age 40 were terminated in contrast to 36.8 percent of those under that age. See Rose, 902 F.2d at 1423. In Rose, we rejected such statistics as insufficient to raise a question of intentional discrimination. See id. We pointed to the fact that older individuals tended to occupy the level of positions eliminated during the reorganization. See id. Likewise, older individuals tended to occupy the sales positions eliminated and outsourced by Quaker. Jeney's statistics failed to account for obvious variables--including education, previous position at the company, and distribution of age groups by position--that would have affected the results of the analysis. See Rea v. Martin Marietta Corp. , 29 F.3d 1450, 1456 (10th Cir. 1994) (holding that to raise an inference of discrimination, statistical evidence should account for possible nondiscriminatory variables); Sheehan v. Daily Racing Form, Inc., 104 F.3d 940, 942 (7th Cir. 1997) (refusing to give weight to statistical evidence that does not account for relevant variables). Cf. Wards Cove Packing Co. v. Atonio,490 U.S. 642, 657 (1989) (Without a showing of causation between the challenged action and the alleged disparities, "employers [would be] potentially liable for the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces."). At this point of the disparate treatment analysis, moreover, Jeney's proof must raise questions as to the veracity of the reasons Quaker gave for not retaining Jeney specifically. "[W]hile statistics are often probative in determining the existence of a pattern or practice of disparate treatment, their usefulness in proving pretext depend[s] primarily upon their relevance to the specific decision affecting the individual plaintiff, [and not ] those that affect [Jeney's] protected class in general. " Penk v. Oregon State Board of Higher Education, 816 F.2d 458, 462 (9th Cir. 1987). Because they fail to account for many factors pertinent to Jeney, we conclude that the statistics are not enough to take this case to trial.
 
 
 35
 Nor does the EEOC reasonable cause determination create a genuine issue of material fact. An EEOC letter is a "highly probative evaluation of an individual's discrimination complaint." Plummer v. Western Int'l Hotels Co., Inc., 656 F.2d 502, 505 (9th Cir. 1981). As required by our case law, the district court properly admitted the letter into evidence. Such letters, however, "are not homogeneous products; they vary greatly in quality and factual detail." Johnson v. Yellow Freight System, Inc., 734 F.2d 1304, 1309 (8th Cir. 1984). The EEOC letter in this case stated simply that "The Commission's investigation finds reasonable cause to believe that [Quaker] has violated the [ADEA]. The Commission further finds that employees over the age of 40, as a class, were laid of in violation of [ADEA]." It is impossible from this letter to know what facts the EEOC considered and how it analyzed them. Examining similarly conclusory EEOC letters, other circuits have concluded that when the letters only report "bare conclusions," they have little probative value. See Cortes v. Maxus Exploration Co., 977 F.2d 195, 201-02 (5th Cir. 1992); see also Goldberg v. B. Green & Co., Inc., 836 F.2d 845, 848 (4th Cir. 1988). In previous cases, we have upheld summary judgment in cases in which the EEOC itself has brought suit. See, e.g., EEOC v. Insurance Co. of N. Am., 49 F.3d 1418 (9th Cir. 1995). If the EEOC's suing is insufficient to create a genuine issue of material fact, then, a priori, a conclusory EEOC reasonable cause letter, at least by itself, does not create an issue of material fact.
 
 
 36
 Next, Jeney asserts that Quaker refused to hire him because it was looking for someone "young and promotable, " or at least that Quaker's use of the word "promotable " was an illegal synonym for "young." Quaker's employees testified to using the word "promotable," but stated that they never used the word "young." Jeney's own testimony is mixed on this issue. Although in his affidavit Jeney stated that he had heard that they had said "young or promotable," he cast doubt on this declaration when during his deposition he stated that "Boyd said that Rucker told him it had to go to somebody young and mobile or promotable, or whatever term you want o use."[3]
 
 
 37
 In the context of this case, the word "promotable" by itself does not give rise to an inference of discriminatory motive. As Quaker explained, and Jeney does not contradict, the reorganization of the company eliminated hundreds of low-level positions, the type of jobs that individuals like Jeney once kept for years without any expectation that they would need to advance in the company. Once these positions were farmed out to independent brokers, the remaining positions were higher level: a few customer management positions and many account executive positions. Hence, Quaker expected its customer managers to be promotable to account executive positions within two years. Promotability became an increasingly important consideration in hiring customer managers. Cf. Furr v. Seagate Technology, Inc. , 82 F.3d 980, 987 (10th Cir. 1996) (stating that promotability is a legitimate employer consideration). Given this background, none of which is contradicted by Jeney, the use of the word promotable does not give rise to suspicions of age discrimination. Moreover, we have held that the use of far more suggestive words on the part of management do not create a genuine issue of material fact as to age discrimination. See Nesbit v. Pepsico, Inc., 994 F.2d 703, 705 (9th Cir. 1993) (holding that employer's use of the phrase "[w]e don't necessarily like grey hair" did not support an inference of discriminatory motive); Nidds, 113 F.3d at 918-19 (holding that employer's use of the phrase "old timers" did not support inference of discriminatory motive); Rose, 902 F.2d at 1423 (holding that employer's use of the phrase "old-boy network" did not support inference of discriminatory motive); Insurance Co., 49 F.3d at 1421 (holding that rejecting employee because he was "overqualified" did not support inference of discriminatory motive). Cf. Hazen Paper Co. v. Biggins, 507 U.S. 604, 611 (1993) (holding that even adverse employment actions motivated by factors strongly correlated with age are not illegal under ADEA). Although Jeney has proferred sufficient evidence to raise a question of fact as to whether one member of Quaker's man-agement used the words "young and promotable, " this is not sufficient to raise a question of fact as to whether the reasons Quaker gave for laying Jeney off were pretexts for age discrimination. See Merrick v. Farmers Ins. Group , 892 F.2d 1434, 1438-39 (9th Cir. 1990) (holding that the hiring supervisor's statement that he hired another employee over the plaintiff because he was "a bright, intelligent, knowledgeable young man" was not enough to raise an inference of age discrimination).
 
 
 38
 Fourth, Jeney attacks the rating system used by Quaker as subjective and thus a cover for age discrimination. While a subjective evaluation system can be used as cover for illegal discrimination, subjective evaluations are not unlawful per se and "their relevance to proof of a discriminatory intent is weak." Sengupta v. Morrison-Knudsen Co., Inc. , 804 F.2d 1072, 1075 (9th Cir. 1986). Most of Jeney's criticism of the ratings system centers on his contention that it did not do a good job of evaluating the employees and other methods, such as standardized testing, would have done better. Jeney's expert witnesses concluded as much. But this allegation does little to help Jeney establish that Quaker used a subjective system in order to discriminate against older employees. That Quaker made unwise business judgments or that it used a faulty evaluation system does not support the inference that Quaker discriminated on the basis of age. See Sharpe v. AT&T Co., 66 F.3d 1045, 1050 (9th Cir. 1995) (applying state law); Cotton v. City of Alameda, 812 F.2d 1245, 1249 (9th Cir. 1987) ("The ADEA does not make it unlawful for an employer to do a poor job of selecting employees. It merely makes it unlawful to discriminate on the basis of age."). Jeney offers one item of proof that could create such an inference: employees over age 40 received significantly lower rankings on average than employees under age 40. Ultimately though, these statistics suffer from the same infirmity as the statistics regarding the layoffs--they do not account for any relevant factors that might explain the variation.
 
 
 39
 Fifth, Jeney asserts that younger, less qualified individuals were hired for the jobs for which he was qualified. As evidence of his qualifications, Jeney relies primarily on his years of experience and his strong performance reviews. But "[t]he question is not whether [Jeney] in the abstract had better qualifications than the other candidates. The question is whether the other candidates are more qualified with respect to the criteria that [Quaker] actually employs." Cotton, 812 F.2d at 1249 (rejecting the ADEA claim of an employee who argued he had more experience than those hired). Jeney's "subjective personal judgments of [his] competence alone do not raise a genuine issue of material fact." Bradley v. Harcourt, Brace and Co., 104 F.3d 267, 270 (9th Cir. 1996).
 
 
 40
 Of the six jobs filled in the Phoenix area following the ratings, four were account executive positions. These positions would have required a promotion of four levels for Jeney. As Jeney himself attests, such a promotion is unheard of in the company. The fifth position--broker field manager--would have also represented a comparable promotion. This left the opening for a customer manager, a job requiring a one-level promotion and a position for which Jeney was considered. Thus, Jeney must raise a genuine issue that Quaker's reasons for hiring others instead of him for the customer manager position are pretexts. Jeney argues that he was more qualified than Lisa Rodriguez, Bryan Hardman, Glen Synoground, Robert Dumais, Ken Oliver, and Stacey Ring. First, Rodriguez, Hardman, and Synoground were hired as account executives, the position four levels above Jeney's. Rodriguez had already held a comparable position to the senior account executive job she was given. Robert Dumais, a 40-year-old white male who had already held an account executive position in San Antonio, was selected as a customer manager, but within months was promoted to account executive when another employee retired.
 
 
 41
 Ken Oliver, a 34-year-old white male with a degree in marketing and who was studying for his M.B.A. during the evenings, fit Quaker's emphasis on analytical skills. Quaker stated that it also hired Oliver on the basis of a recommendation from an outside broker who knew both Oliver and Jeney. Cf. Merrick, 892 F.2d at 1437 (stating that the hiring supervisor may properly rely on the recommendation of others in making his decision). Quaker believed he was more likely than Jeney to be promoted to account executive, an important consideration in the new company. Stacey Ring, a 26-year-old white female, had a degree in quantitative economics and Quaker believed she was more qualified that Jeney to participate in analytical projects at headquarters.
 
 
 42
 Jeney's subjective evaluation of his qualifications cannot raise an issue of material fact, and the one non-subjective qualification he points to is his number of years of experience. All but one of these years of experience was as a sales representative. The little headquarters experience Jeney did have came as an assistant for a year to two supervisors and involved making schematics for shelf placement. See Merrick, 892 F.2d at 1438 (holding that a plaintiff has not raised an inference of discrimination where he introduces evidence that he may have been more qualified in some respects than the chosen employee, but introduces no evidence that the company's stated reasons for not hiring him were pretextual); Cotton, 812 F.2d at 1249 (holding that the number of years of experience is not relevant where this is not one of the qualifications sought by the employer). Furthermore, his case is weakened by the fact that Ken Willis, who created the special ARM position for Jeney in 1993, was the same individual who made the decision not to rehire him initially."[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." Bradley, 104 F.3d at 270-71. In both Bradley and in Jeney's case, the decisions to hire and then to terminate were about a year apart. See id. at 269.
 
 
 43
 Finally, Jeney attacks many of the grounds Quaker gives for firing him because he was not told of these reasons when he was let go. Jeney is correct that doubt is cast on an employer's proffered reasons for why an employee was laid off where a straightforward answer was not given when he or she was terminated, but later is provided during litigation. See Lindhal, 930 F.2d at 1438 ("[T]he computer explanation would have been such a straightforward answer to[the employee's] inquiries that one might expect that [her supervisors] would have mentioned it if it really were the explanation."). In Jeney's case, however, Quaker informed all the employees that they were being terminated pursuant to the RIF in which low-level sales positions were eliminated and the employees retained would be in higher level supervisory or management positions. The ratings systems Quaker used to help determine who remained included many of the specific reasons Quaker gave during the litigation to explain why Jeney was not as qualified as other employees, including Jeney's lack of headquarters experience and skills and the fact they considered him unlikely to be promoted. As the later reasons mainly detail the earlier one, they are "not properly described as `shifting reasons.' " Nidds, 113 F.3d at 918 (holding that employer's first explanation that "lack of work" was the reason for the layoffs and later statement that "lack of seniority and poorer performance relative to other mechanics" was the reason for the particular employee's termination did not create a genuine issue of material fact as to whether employer's reasons were pretextual). Quaker has consistently explained that the reorganized company required employees with increased analytical abilities. Jeney has not cast doubt on the sincerity of this explanation or on Quaker's conclusion that his skills were not as strong in this area as those of the individuals retained.
 
 
 44
 Jeney had over twenty years of experience as a sales representative. But Quaker was no longer employing sales representatives. Their responsibilities were filled by outside brokers. All of the positions at Quaker now required the employees to have analytical and management skills. In the RIF context, Jeney must show that the skills he had continued to be needed by the company. "Without the demonstration of a need for the same services and skills that [Jeney] possessed," Jeney's case falters. Sengupta, 804 F.2d at 1075. Jeney has not made such a demonstration. Simply put, Quaker no longer employed anyone to do the job Jeney had done for over 20 years. " `In a reduction-in-force case, there is no adverse inference to be drawn from an employee's discharge if his position and duties are completely eliminated. . . . If [Jeney] cannot show that [Quaker] had some continuing need for his skills and services in that his various duties were still being performed, then the basis of his claim collapses.' " Rose, 902 F.2d at 1421 (quoting Leichihman v. Pickwick Int'l, 814 F.2d 1263, 1270 (8th Cir. 1987)).
 
 
 45
 To survive summary judgment, the burden is on Jeney to "produce enough evidence to allow a reasonable fact finder to conclude either: (a) that the alleged reason for[his] discharge was false, or (b) that the true reason for his discharge was a discriminatory one." Nidds, 113 F.3d at 918. Looking at the evidence in the light most favorable to Jeney, no reasonable juror could conclude--on the bases of the statistics that did not account for obvious factors, the evidence regarding Quaker's use of "promotable" or "younger," Jeney's own evaluations of his relative qualifications, and his assertion that the ratings were unduly subjective--that Quaker intentionally discriminated against him because of his age. Thus, we affirm the district court's grant of summary judgment on Jeney's disparate treatment claim under ADEA.
 
 2
 
 46
 Gentile makes essentially the same case as Jeney does in opposing summary judgment on whether Quaker's reasons for firing him are pretexts for age discrimination. To the extent that Gentile's case rests on the statistical evidence, the EEOC determination, Quaker's alleged statements regarding Jeney's youth and promotability, and the rating system, and his contention that Quaker's stated reasons for terminating him have shifted, we reject it for the reasons explained with respect to Jeney. Gentile's assertion that Quaker hired younger, less qualified individuals for the jobs for which he was qualified, however, requires separate analysis.
 
 
 47
 As evidence of his qualifications, Gentile relies primarily on his years of experience as a customer manager and his strong performance reviews. But as with Jeney "[t]he question is not whether [Gentile] in the abstract had better qualifications than the other candidates. The question is whether the other candidates are more qualified with respect to the criteria that [Quaker] actually employs." Cotton , 812 F.2d at 1249. In addition, his more recent performance reviews reveal that Gentile failed to conduct analyses and improperly focused on sales volume rather than profitability.
 
 
 48
 Of the six jobs filled in the Phoenix area following the ratings, four were account executive positions, one was for a broker field manager, and one for a customer manager. Gentile asserts that he is more qualified than three individuals chosen for the Phoenix office: Lisa Rodriguez, Bob Dumais and Glen Synoground. He also states that he is more qualified than two other employees retained in the Los Angeles office as customer managers: Bryan Hardman and Stacey Ring.
 
 
 49
 Lisa Rodriguez and Glen Synoground were retained as account executives, positions which would have required a promotion for Gentile. While Gentile was a customer manager, Rodriguez was already a senior account executive and Synoground an account executive before the 1994 RIF. Quaker's failure to fire two higher ranking employees in order to promote Gentile in the midst of a large restructuring involving hundreds of layoffs does not raise an inference of discrimination. All three of the remaining employees hired as customer managers rated higher than Gentile; there is ample evidence of Gentile's weak analytical abilities, a crucial consideration at a time when the nature of the job was changing. Two of the individuals retained as customer managers, Hardman and Ring, worked in the Los Angeles office. We have previously noted that a company need not transfer an employee to another office during a RIF in order to retain him. See Rose, 902 F.2d at 1422. During the 1994 nationwide RIF, no employee who received Gentile's low rating was moved to another office. Bob Dumais, retained as a customer manager, had already held an account executive position in the San Antonio office. Gentile proffers no evidence that his analytical abilities are superior to those of the employees Quaker retained, the very skills Quaker has given as the rationale for its employment decisions. Gentile's "subjective personal judgments of [his] competence alone do not raise a genuine issue of material fact." Bradley, 104 F.3d at 270. Furthermore, Ken Willis, who in 1993 retained both Gentile and Coleman over a third employee when one of three positions was eliminated, was the supervisor responsible for filling the positions for which Gentile was not selected in 1994. As with Jeney, this fact gives rise to an inference that no discrimination took place. See id. at 270-71.
 
 
 50
 Like Jeney, Gentile has failed to "produce enough evidence to allow a reasonable fact finder to conclude either: (a) that the alleged reason for [his] discharge was false, or (b) that the true reason for his discharge was a discriminatory one." Nidds, 113 F.3d at 918. Accordingly, the district court did not err when it granted Quaker's motion for summary judgment with respect to Gentile's ADEA claim of disparate treatment.
 
 3
 
 51
 Although Coleman was terminated a year later during the 1995 RIF, his case remains analytically similar to those of Jeney and Gentile. Quaker assumes, as will we, that Coleman has established a prima facie case of disparate treatment on the basis of age. Quaker states that it had initially decided to retain Coleman over another employee, Bob Dumais, in 1995, but terminated him after Dumais' supervisor fought harder than Coleman's to save his job. In response to the explanation articulated by Quaker for laying him off in 1995, Coleman puts forth the following evidence: statistics regarding the 1994 RIF; the EEOC finding of reasonable cause; Quaker's retention of younger, less experienced employees; and Quaker's settlement offer.
 
 
 52
 We have already addressed the weaknesses of the statistical evidence in the context of Jeney's case. In Coleman's case, the district court struck this evidence from the record. The court noted that almost all the analysis was based on the 1994 data, that the limited analysis of the 1995 data considered no relevant variables, and that the 1995 data analysis included all post-1994 terminations, not just the 1995 RIF discharges. Although Coleman uses the evidence in his brief to our court, he never challenges the district court's order striking the evidence. Accordingly, he has waived this issue, and the statistical evidence cannot be considered part of the record. See Alaska Ctr. for Env't v. U.S. Forest Serv., 189 F.3d 851, 858 n.4 (9th Cir. 1999).[4] Therefore, Coleman's attack on the subjective nature of the rating system is besides the point. Moreover, Coleman's 1994 promotion indicates that he benefitted from this system.
 
 
 53
 The EEOC reasonable cause determination is as conclusory in Coleman's case as it is in Jeney's and Gentile's. In fact it appears to have been a form letter. Indicative of its conclusory nature and lack of probative value, the EEOC letter in Coleman's case includes the recitation that Quaker discriminated against older employees as a class despite the fact that there was no class in 1995 when Coleman was terminated. Coleman was the only employee laid off in that RIF who filed an EEOC charge, and the EEOC had no information regarding other employees terminated that year.
 
 
 54
 Like Jeney and Gentile, Coleman asserts that younger, less qualified individuals were retained in jobs for which he was qualified. Specifically, Coleman points to Lisa Rodriguez, Bart Wassom, Quentin Burrell, Bryan Hardman, Robert Dumais, and Ken Oliver. As evidence of his qualifications, Coleman relies primarily on his years of experience and his strong performance reviews. In order to survive summary judgment, Coleman must raise a genuine issue of material fact as to whether the reasons Quaker has given for retaining these six individuals instead of him are pretexts. First, Coleman concedes that he should not have been retained over Rodriguez. Second, Bart Wassom and Quentin Burrell were not hired in Phoenix, they were hired in Los Angeles. Quaker had no duty to transfer Coleman to another part of the country. See Rose, 902 F.2d at 1422 ("When an employer reduces its work force for economic reasons, it incurs no duty to transfer the employee to another position within the company."). In the 1995 RIF, the decisions on which employees to retain were purely local. Quaker did not transfer employees to other regions when it discharged Coleman. Coleman points to no evidence to the contrary.
 
 
 55
 Despite Coleman's assertion that he was more qualified than Hardman, Hardman scored higher in the 1995 ratings. Unlike Jeney and Gentile with respect to the 1994 evaluations, Coleman does not attack the ratings method used in the 1995 RIF as a cover for age discrimination. We have held that where the plaintiff does not even attack the selection criteria as having a disparate impact on the protected class,"[w]e will not second guess the selection criteria used by an employer." Cotton, 812 F.2d at 1249. Quaker has said that it retained Hardman because he was more qualified. Hardman scored better than Coleman, and Coleman does not challenge the rating as biased. Coleman's "subjective personal judgments of [his] competence alone do not raise a genuine issue of material fact." Bradley, 104 F.3d at 270.
 
 
 56
 Coleman and Dumais competed for the final position. Quaker initially selected Coleman. After a protracted struggle between their respective managers, Forbes, Dumais's manager, won out. Dumais was retained and Coleman discharged. Coleman points to no evidence that this account is not credible. He states only that Forbes's statements may be believed or disbelieved by the jury. This is not enough to withstand summary judgment. See Wallis, 26 F.3d at 890 ("[The plaintiff] must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses."); Lindahl, 930 F.2d at 1437-38 ("The plaintiff cannot carry this burden simply by restating the prima facie case and expressing an intent to challenge the credibility of the employer's witnesses on cross-examination."). Nor, in the context of this decision, are his assertions that he is more qualified than Dumais to the point. In this case, Quaker admits that Coleman scored one point above Dumais. In fact because of this, it had initially decided to retain Coleman. Quaker's legitimate, nondiscriminatory reason is that Forbes convinced Coleman's manager that Dumais should be kept over Coleman, and Coleman has introduced no evidence to cast doubt on this version of the hiring decision. The "favoritism" of managers is "not age discrimination." Shutt v. Sandoz Crop Protection Corp., 944 F.2d 1431, 1433 (9th Cir. 1991).
 
 
 57
 The last employee to whom Coleman points as less qualified than he is Oliver. Quaker admits that Oliver, a customer manager, is less qualified in the abstract than Coleman, an account executive, but states that because of this Oliver was a more appropriate fit for the customer manager position. For Coleman to take the position would have meant a demotion and a sharp cut in salary. While we have recognized that "over qualification" as a reason for firing an employee may be a mask for age discrimination, an employer may choose not to hire an employee because he is overqualified for a position without violating ADEA. See Insurance Co., 49 F.3d at 142021. This is particularly true where the criteria that make the employee overqualified and the reasons for the employer's concern are defined. See id. at 1421. Here, Coleman does not contradict Quaker's argument that placing him in this position would have meant a large pay cut and a two-step demotion. Coleman's previous position as an account executive is an objective criterion and Quaker defined its concern that a demotion would have meant a loss of morale. Thus explained, Quaker's rejection of Coleman as overqualified is a legitimatenon discriminatory reason and Coleman has introduced no evidence controverting Quaker's position on this issue which would allow him to survive summary judgment. See id. In sum, Coleman has not raised a genuine issue of fact as to whether the reasons Quaker gave for not retaining him instead of these six employees were pretextual.
 
 
 58
 Finally, Coleman argues that the district court should have admitted into evidence Quaker's offer of additional medical benefits in exchange for Coleman's release of claims against the company. The district court excluded this evidence under Federal Rule of Evidence 408.[5] In Cassino v. Reichhold Chemicals, Inc., 817 F.2d 1338 (9th Cir. 1987), we created an exception to the general rule against admitting offers to settle a case. In Cassino, we held that it is not an abuse of discretion for the trial judge to admit evidence of an employer's offer of a "severance pay package in exchange for a release of all potential claims" when the offer is "contemporaneous" with the termination of the employment relationship. Id. at 1342. The court made clear, however, that offers made "in connection with the negotiation and settlement of disputes arising after the termination" remain inadmissable. Id. Thus, where an employer offered outplacement services, in addition to its ordinary severance package, three weeks after the employee's discharge in exchange for a release, the district court properly excluded evidence of the offer even where the employee had yet to file any claims. See Mundy v. Household Finance Corp., 885 F.2d 542, 546-47 (9th Cir. 1989).
 
 
 59
 In Coleman's case, he had been informed in March 1995 of his discharge and he received his severance package without condition. On May 8, he filed his age discrimination charge with the EEOC. On May 12, Quaker offered him additional medical benefits in exchange for a release of claims. As the settlement offer was not contemporaneous with termination and the consideration was additional to the standard severance benefits, the district court did not abuse its discretion in excluding the offer. See Mundy, 885 F.2d at 547. Coleman's contention that the district court should not have excluded the evidence because Quaker may not have known of the EEOC charge when it made him the offer is foreclosed by Mundy. In Mundy, the plaintiff had only hired an attorney; he had not brought a charge, much less made his charge known to the company. See id. Still, we held that the trial judge did not abuse his discretion in excluding the evidence. See id. Here, Coleman had already filed his charge with the EEOC. Accordingly, this evidence cannot be considered to determine whether Coleman has raised a genuine issue of material fact.
 
 
 60
 To survive summary judgment, the burden is on Coleman to "produce enough evidence to allow a reasonable fact finder to conclude either: (a) that the alleged reason for [his] discharge was false, or (b) that the true reason for his discharge was a discriminatory one." Nidds, 113 F.3d at 918. Looking at the evidence in the light most favorable to Coleman, no reasonable juror could conclude--on the basis of the EEOC determination and the evidence regarding the reasons for Quaker's hiring decisions--that Quaker intentionally discriminated against him because of his age. Thus, we affirm the district court's grant of summary judgment on Coleman's ADEA disparate treatment claim.
 
 III
 
 61
 When challenging an adverse employment action under the ADEA, an employee may proceed under two theories of liability: disparate treatment or disparate impact. Under the disparate impact theory, employees must prove that a facially neutral employment practice had a discriminatory impact on older workers. See Rose, 902 F.2d at 1421. They need not prove motive or intent, but the company can defend by establishing that the challenged practice was based on legitimate business reasons, such as job-relatedness or business necessity. See id. at 1424. At that point, the employee would have to show that other selection practices could serve the same business interest identified by the company without having a discriminatory effect. See id.
 
 
 62
 The district court dismissed Jeney's, Gentile's, and Coleman's disparate impact claims on the grounds that they had not pled this theory of liability in their complaint. Jeney, Gentile and Coleman do not dispute that neither their first nor second amended complaints included this theory of liability. They admit that the first time they raised this claim was in their motions for summary judgment. Rather, the employees argue that either they need not specifically allege the disparate impact theory in the complaint or the district court should have allowed them to amend their complaints to add this theory at the summary judgment stage.
 
 
 63
 We have yet to decide whether both theories of liability-disparate impact and disparate treatment--must be alleged in the complaint in order to provide the basis for later trial or summary judgment.[6] But cf. Klein v. Boeing Co., 847 F. Supp. 838, 844 (W.D. Wash. 1994) ("Klein never asserted this claim prior to his opposition to Boeing's motion for summary judgment, nor has he moved to amend his complaint to add such a claim. Thus, this claim is not properly before the court."). Jeney, Gentile, and Coleman rely on Gomes v. AVCO Corp., 964 F.2d 1330 (2nd Cir. 1992), for the proposition that disparate impact need not be separately alleged. In Gomes, the district court had dismissed the discriminatory impact theory of liability because it found that the plaintiff had not raised it in his EEOC compliant, which must be filed before a case is brought. See id. at 1334. Reversing, the Second Circuit held that Gomes' EEOC complaint would have caused the defendant reasonably to expect that the discriminatory impact of its facially neutral rule would also be investigated by the EEOC. See id. The employees argue that, similarly, the allegation of discriminatory treatment in their district court complaint gave Quaker notice that both theories of liability could be pursued.
 
 
 64
 Thus the issue is whether Jeney, Gentile and Coleman, having failed to allege the discriminatory impact theory of liability, may nevertheless proceed under that theory after the close of discovery in their motion for summary judgment. Their case is more akin to Josey v. John R. Hollingsworth Corp., 996 F.2d 632 (3d Cir. 1993). In Josey, the Third Circuit held that where a plaintiff sets forth only the disparate treatment theory in his pleadings and does not move to amend his complaint until summary judgment following the close of discovery, the plaintiff is barred from proceeding on the disparateimpact theory. See id. at 641-42. The court reasoned that adding a new theory of liability at the summary judgment stage would prejudice the defendant who faces different burdens and defenses under this second theory of liability. See id. at 642. The court held that the plaintiff should have moved to amend his pleadings during discovery. See id. ; see also Kalsi v. New York City Transit Auth., 62 F.Supp.2d 745, 760-61 (E.D.N.Y. 1998), aff'd, 189 F.2d 462 (2nd Cir. 1999).
 
 
 65
 We agree. Allowing Jeney, Gentile and Coleman to proceed with their disparate impact theory after the close of discovery would prejudice Quaker. A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations. A disparate impact theory, lacking the requirement that the plaintiff prove intent and focusing on statistical analyses, requires that the defendant develop entirely different defenses, including the job relatedness of the challenged business practice or its business necessity. Neither of these are necessary to defend against a disparate treatment theory. This case illustrates the problem. At no time prior to summary judgment, did Jeney, Gentile, or Coleman identify which facially neutral Quaker employment practice they challenged as having a discriminatory impact. Cf. Josey, 996 F.2d at 642. The district court judge's opinion indicates that after more than two years of discovery, he had no idea until the employees' motions for summary judgment were filed that they intended to pursue this legal theory. The lack of notice on this issue central to the cause of action makes it difficult, if not impossible, for Quaker to know how to defend itself. After having focused on intentional discrimination in their complaint and during discovery, the employees cannot turn around and surprise the company at the summary judgment stage on the theory that an allegation of disparate treatment in the complaint is sufficient to encompass a disparate impact theory of liability.
 
 
 66
 The Second Circuit's decision in Gomes does not teach otherwise. See Kalsi, 62 F.Supp.2d at 760-61 (following Josey in the Eastern District of New York). Cf. AFSCME v. County of Nassau, 96 F.3d 644, 647 (2d Cir. 1996) (stating in its recitation of the facts that "[b]ecause AFSCME never amended its complaint to adequately plead a disparate impact claim, AFSCME was required to introduce evidence from which it could be inferred that the County intentionally discriminated in setting the pay scale in order to prevail under a disparate treatment theory."). In Gomes, the district court had dismissed the complaint containing both theories of ADEA liability because it was broader than the plaintiff's EEOC charge. Gomes did not confront the very different situation we face here in which the plaintiffs proceeded at summary judgment on a new theory. An EEOC charge leads only to an investigation, and once a complaint is filed in court, the defendant has ample opportunity to prepare its defenses during discovery. Thus the concerns that animated the Third Circuit in Josey were not present in Gomes. In Gomes, there had been no discovery, and the parties had not spent years developing the evidence to prove their cases.
 
 
 67
 The dissent cites two Ninth Circuit cases, one which is not relevant and another which supports our holding. First, the dissent urges that the language of a footnote in EEOC v. Local 350, Plumbers and Pipefitters, 998 F.2d 641(9th Cir. 1993), be applied outside of the very limited and special context of that case. See post at 14960-61. Local 350 reversed the district court's grant of summary judgment in favor of the union on the EEOC's action under ADEA. See id. at 643. While Local 350 was pending, Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993), was decided. Hazen, as noted in Local 350, set forth "the parameters of disparate treatment in the age discrimination context." Id. at 648 n.2. The court also noted Hazen's articulation of the disparate impact claim.[7] See id. In this same footnote, the panel acknowledges that "both theories were potentially available to the EEOC." Id. The court then remanded to the district court with the exceptional order to "direct the EEOC to articulate its theory or theories of discrimination in accordance with the principles set forth in Hazen." Id.
 
 
 68
 The principles set forth in Hazen, as discussed in Local 350, concerned the requirements for disparate treatment and disparate impact claims. See id. The court recognized that the EEOC filed its complaint prior to the decision in Hazen and amid confusion of what claims were cognizable under the ADEA. The remand order gave the EEOC an opportunity to articulate its claims in light of Hazen's explication of potential ADEA claims. Plaintiffs filing ADEA claims after Hazen would presumably be aware of their potential Hazen-based claims. Since Jeney's, Gentile's, and Coleman's complaints were filed after Hazen was decided, the footnote in Local 350 cited by the dissent is simply not applicable to them.
 
 
 69
 The dissent also incorrectly relies on Arnett v. California Public Employees Retirement System, 179 F.3d 690 (9th Cir. 1999), vacated and remanded on other grounds, _______ U.S. _______, 120 S.Ct. 930 (2000), to support its proposition that unspecific statements in the pleadings will suffice to raise a claim of disparate impact. See post at 14961-62. Arnett, however, supports our analysis. There, the court reversed the district court's dismissal of plaintiff's disparate impact and disparate treatment claims. See id. at 692. The facts of Arnett are vastly different from those here. First, in Arnett, the plaintiffs had pled a "disparate impact" claim. See id. at 693. Second, the court determined that the pleading was sufficient because the plaintiffs alleged "that the consequences of [the disputed practice] f[e]ll more harshly on those employees hired at age 40" and had documented the impact of the disputed practice. Id. at 697. Here, the plaintiffs have not fulfilled any of the conditions examined by the court: They have not stated that they were alleging a "disparate impact" claim, nor alleged that the consequences of a practice fell more harshly on them, nor provided documentation of the disparity with their complaint.
 
 
 70
 Thus, we hold that the plaintiffs, who clearly stated ADEA claims of disparate treatment but sought also to pursue claims of disparate impact, were required either (1) to plead the additional disparate impact theory in their complaints, or (2) to make known during discovery their intention to pursue recovery on the disparate impact theory omitted from their complaints. Only if the defendants have been put on notice may the plaintiffs proceed on a disparate impact theory at the summary judgment stage. Because Jeney, Gentile and Coleman raised the disparate impact theory of liability for the first time at summary judgment, the district court did not err when it did not allow them to proceed on it.[8]
 
 IV
 
 71
 Jeney, Gentile, and Coleman argue that, even if they are required to plead the disparate impact theory in their complaints, the district court should have granted their motions to amend their pleadings to include such a claim. The employees moved to amend their complaints in their replies to Quaker's response to their motion for summary judgment. The district court denied their motions because they did not show good cause for failing to amend their complaints earlier.
 
 
 72
 Generally, Federal Rule of Civil Procedure 15(a) liberally allows for amendments to pleadings. In this case, however, the district court correctly found that it should address the issue under Federal Rule of Civil Procedure 16 because it had filed a pretrial scheduling order that established a timetable for amending the pleadings, and the deadline had expired before Jeney, Gentile, and Coleman moved to amend. See Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 607-09 (9th Cir. 1992). Under Rule 16(b), Jeney, Gentile, and Coleman must show good cause for not having amended their complaints before the time specified in the scheduling order expired. See id. at 608-09. This standard "primarily considers the diligence of the party seeking the amendment. " Id. at 609.
 
 
 73
 Jeney, Gentile, and Coleman did not move to amend their complaints to add the disparate impact theory of liability until their reply to Quaker's motion for summary judgment. Despite having hired a statistical expert years before the summary judgment motions and having received the first statistical report noting the disparities between the retention of older and younger employees over a year before filing for summary judgment, the employees had never moved to amend their complaints. In fact, Jeney and Gentile had the statistical report before they amended their complaint to add the Title VII allegations. Jeney, Gentile, and Coleman do not offer any explanation for their failure to amend their complaints earlier. See Acri v. International Ass'n of Machinists and Aerospace Workers, 781 F.2d 1393, 1398 (9th Cir. 1986) (stating that even under the liberal Rule 15 standard "late amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action."). Moreover, granting the request to amend the complaint would likely have required reopening discovery so that Quaker could develop its evidence to prepare its defenses to this theory. "A need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice from a delayed motion to amend the complaint." Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 986 (9th Cir. 1999). This prejudice to Quaker, although not required under Rule 16(b), supplies an additional reason for denying the motion. See Johnson, 975 F.2d at 609. Because Jeney, Gentile, and Coleman have failed to show diligence, "the inquiry should end." Id. Thus, the district court did not abuse its discretion when it denied their motions to amend their complaints.
 
 V
 
 74
 * In Jeney's and Gentile's original discrimination claims with the EEOC, they charged only that they had been discriminated against because of their age. During discovery, they came upon a document entitled "Workforce 2001" describing Quaker's goals for a workforce diverse in terms of race and sex. Jeney and Gentile then filed an additional complaint with the EEOC charging that they had been discriminated against because they were white males and filed a second amended complaint alleging that Quaker had violated 29 U.S.C. S 2000e ("Title VII").[9] The district court allowed this amendment, but then granted summary judgment to Quaker on this issue on the grounds that their allegation was untimely. Alternatively, the judge ruled that Jeney and Gentile could not make out a prima facie case of race or sex discrimination.
 
 B
 
 75
 The analysis under Title VII is the same as that under ADEA. See Wallis, 26 F.3d at 888. Thus, because Jeney and Gentile were fired in the context of the RIF, they must produce statistical, direct or circumstantial evidence that their "discharge occurred under circumstances giving rise to an inference of" discrimination on account of race or sex. Id. at 891. Despite the fact that the standard is very low, they can not meet it. In contrast to their age discrimination claims, Jeney and Gentile have no statistics that demonstrate any sort of disparate treatment in layoffs on the basis of race or sex. Of the six positions filled in Phoenix for which Jeney might have been considered, all six went to other white employees, five of whom were men. Of the ten employees retained by Quaker and mentioned by Gentile as his competition, nine were white and eight were men.
 
 
 76
 To support an inference of discrimination, Jeney and Gentile point only to the existence of the Workforce 2001 program, with its stated goal of increasing diversity in management, and to the fact that the RIF was monitored to determine whether it had any impact on women or minorities. Quaker states that it never acted pursuant to the affirmative action plan or the monitoring during the RIF. Jeney and Gentile point to no evidence showing that they were affected by the Workforce 2001 plan or the monitoring. Furthermore, they do not point to any evidence showing that Quaker took any action in response to its monitoring of the RIF."[T]he mere fact of an affirmative action plan's existence is not relevant to proving discrimination unless the employer acted pursuant to the plan." Cerrato v. San Francisco Community College Dist., 26 F.3d 968, 976 (9th Cir. 1994). Because Jeney and Gentile have not raised a question of material fact as to whether they were discriminated against on the basis of their age and sex, the district court did not err when it granted summary judgment in favor of Quaker on this claim.[10]
 
 VI
 
 77
 Jeney, Gentile, and Coleman argue that the district court improperly severed their original case, along with seven other plaintiffs, against Quaker. Under Federal Rule of Civil Procedure 20, joinder is proper if (1) the plaintiffs asserted a right to relief arising out of the same transaction and occurrence and (2) some question of law or fact common to all the plaintiffs will arise in the action. See Fed. R. Civ. P. 20(a); Desert Empire Bank v. Insurance Co. of N. Am., 623 F.2d 1371, 1375 (9th Cir. 1980). Even once these requirements are met, a district court must examine whether permissive joinder would "comport with the principles of fundamental fairness" or would result in prejudice to either side. Desert Bank, 623 F.2d at 1375. Under Rule 20(b), the district court may sever the trial in order to avoid prejudice. See Fed. R. Civ. P. 20(b).
 
 
 78
 Ten plaintiffs joined in the first complaint. All ten were fired in the RIFs and all ten alleged age discrimination. Considering Quaker's motion for severance, the district court first found that the plaintiffs' case met both prongs of Rule 20(a). The court then examined the potential prejudice to Quaker resulting from joinder and concluded that severance was appropriate. The district court found that Quaker would be prejudiced by having all ten plaintiffs testify in one trial. See Moorhouse v. Boeing Co., 501 F. Supp. 390, 393 n.4 (E.D. Pa.) (stating that "even the strongest jury instructions could not have dulled the impact of a parade of witnesses, each recounting his contention that defendant laid him off because of his age"), aff'd, 639 F.2d 774 (3d Cir. 1980). In addition, the district court emphasized the danger of jury confusion. For each plaintiff, the jury would have had to examine individually his or her employment history as well as the explanations given by Quaker for not retaining him or her, explanations that would require the testimony of each employee's supervisors and raters. Legal confusion was also likely because the plaintiffs had worked for Quaker in six different states, and the jury would have had to evaluate their state law claims in light of the different laws of each state. The court found that the likelihood of prejudice and confusion outweighed the gains from judicial economy and any potential prejudice to the plaintiffs who would try their cases in the states in which they lived and worked.
 
 
 79
 Jeney, Gentile, and Coleman argue now that the district court abused its discretion because severing the cases led to duplicative discovery. As noted above, the court weighed the interests of judicial efficiency and found them outweighed by the potential prejudice to Quaker. Discovery in this case was not as duplicative as it might first appear. Jeney, Gentile, and Coleman, whose cases remained before this district court in Arizona, benefitted from common discovery and counsel, completely coordinating their cases. The district court properly considered the potential prejudice to Quaker created by the parade of terminated employees and the possibility of factual and legal confusion on the part of the jury. Given the broad discretion with which the district court is vested to make a decision granting severance and the fact that the district court carefully weighed the arguments in favor of and against joinder, we conclude that the district court did not abuse its discretion when it granted Quaker's motion to sever the cases.
 
 VII
 
 80
 Jeney, Gentile, and Coleman contend that the district court abused its discretion when it refused to sanction Quaker for its delays in producing documents. We will not disturb the district court's decisions with respect to sanctions "unless we have a definite and firm conviction that the court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Payne v. Exxon Corp., 121 F.3d 503, 507 (9th Cir. 1997). We have reviewed the record and fully considered the employees' argument in this regard, as well as Judge Broomfield's conclusions. In addition to the six specific rulings appealed by the employees, Judge Broomfield considered many motions by the employees to compel evidence and to sanction Quaker. His orders and the correspondence between the attorneys reveal this to have been an acrimonious discovery process. At times Judge Broomfield granted the employees' requests for attorney's fees as sanctions, more often he did not and ordered the parties to cooperate with each other. Throughout these proceedings, he properly considered the legal arguments made by each side and the degree of cooperation they exhibited. We simply cannot say that the court made "a clear error of judgment in . . . weighing . . . the relevant factors." Payne , 121 F.3d at 507. The district court did not abuse its discretion when it denied the employees' motions for sanctions.
 
 VIII
 
 81
 Under ADEA, Title VII, and their state breach of contract claim, Jeney, Gentile, and Coleman might be entitled to attorneys fees had they prevailed. See 29 U.S.C.SS 216(b), 626; 42 U.S.C. S 2000e-5(k); Ariz. Rev. Stat. S 12-341.01. As we have affirmed the district court's grant of summary judgment, the employees have not prevailed and thus are not entitled to attorney's fees.[11]
 
 IX
 
 82
 Because Jeney, Gentile and Coleman have failed to raise a question of material fact as to whether Quaker discriminated against them on the basis of age, race or sex, the districtcourt's grant of summary judgment in favor of Quaker is
 
 AFFIRMED.[12]
 
 
 Notes:
 
 
 [1]
 All ages are as of the year in which the employees were terminated.
 
 
 [2]
 The district court also dismissed Jeney's, Gentile's and Coleman's claims under ERISA, a decision they do not appeal.
 
 
 [3]
 Curiously, Jeney's brief does not cite to (nor do his excerpts of record include) the deposition of Steve Shields, a Quaker account executive, who also reported that Quaker's management would not retain Jeney because they wanted someone "younger." In contrast, Gentile does cite to the Shields deposition. The Shields deposition is in the Jeney record, however, and we have considered it.
 
 
 [4]
 Even in his reply brief, Coleman does not directly challenge the district court's order striking the evidence, although he does cite to cases supporting the proposition that evidence of past discrimination can be relevant to a later case. In any case, issues cannot be raised for the first time in a reply brief. See Alaska Ctr., 189 F.3d at 858 n.4.
 
 
 [5]
 "Evidence of (1) furnishing or offering or promising to furnish . . . a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount." Fed. R. Evid. 408.
 
 
 [6]
 The lack of case law on this issue in the courts of appeal stems in large part from the fact that several of our sister circuits do not recognize a disparate impact cause of action under ADEA after Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993). See, e.g., Ellis v. United Airlines, Inc., 73 F.3d 999 (10th Cir. 1996); Gehring v. Case Corp., 43 F.3d 340 (7th Cir. 1994). We have continued to assume that this theory is still viable after Hazen. See Mangold v. California Pub. Util. Comm'n, 67 F.3d 1470, 1474 (9th Cir. 1995).
 
 
 [7]
 Hazen, while discussing the requirements of a disparate impact claim, specifically left open the question of whether such a claim was cognizable under the ADEA. See Hazen Paper Co. v. Biggins , 507 U.S. 604, 609-10. We have continued to assume that this theory is still viable after Hazen. See Mangold v. California Pub. Util. Comm'n, 67 F.3d 1474 (9th Cir. 1995).
 
 
 [8]
 Palmer v. United States, 794 F.2d 534 (9th Cir. 1986), raised in the employees' reply briefs, is not to the contrary. In Palmer, the district court considered the disparate impact claim despite the fact that it was not specifically alleged in the complaint because the attachments submitted with the complaint raised the theory. See id. at 538. The defendants did not challenge this action, and we only mentioned it as a recitation of the facts. See id. In contrast, Jeney, Gentile, and Coleman gave Quaker no notice either in the complaint, in documents submitted with the complaint, or in any document prior to their motions for summary judgment that they intended to argue this theory.
 
 
 [9]
 Coleman never filed this additional charge with the EEOC or moved to amend his complaint to allege Title VII violations.
 
 
 [10]
 Because we conclude that Jeney and Gentile have not made out a prima facie case of discrimination of the basis of their race or sex, we do not reach the issue of whether they filed their EEOC charges in a timely fashion.
 
 
 [11]
 Thus, we do not reach the employees' argument that obtaining a reversal of summary judgment, the only relief they sought in this appeal, would have entitled them to such fees.
 
 
 [12]
 Jeney's, Gentile's, and Coleman's state law claims for breach of contract and discharge in violation of public policy necessarily fail following summary judgment on the federal claims. Thus we need not reach the issue of whether Quaker's Code of Ethics modified the at will nature of the plaintiffs' employment.
 
 
 B. FLETCHER, Circuit Judge, Dissenting:
 
 83
 I respectfully dissent. The Quaker Oats Company ("Quaker") embarked on a major restructuring of its work force involving considerable downsizing. It sought consultation to prevent gender and racial discrimination in the process, but none to prevent age discrimination. Nobody denies that the statistics in this case show that the reduction in force terminations seriously impacted the older employees -much more so than the younger employees.[1] So regardless of intent, the real issue in this case is whether the process had a disparate impact on the older protected members of the work force.
 
 
 84
 The majority blinds itself to our own circuit precedent and to what all the parties knew this case was about in refusing to look at disparate impact. For this reason, I must dissent.
 
 
 85
 To reach its result -finding disparate impact not sufficiently or timely pled -the panel adopts a rule that is inconsistent with our own prior precedent regarding the Age Discrimination in Employment Act (ADEA). Yet, even under the erroneous rule the panel adopts, the plaintiffs in this case have stated a discrimination claim using the disparate impact theory and the district judge should be required to analyze whether the evidence is sufficient to go to trial on that theory.
 
 
 86
 In Equal Employment Opportunity Commission v. Local 350, Plumbers and Pipefitters, we held that plaintiffs may use the disparate impact theory to prove discrimination under the ADEA. See EEOC v. Local 350, Plumbers and Pipefitters, 998 F.2d 641, 648 n. 2 (9th Cir. 1993) (as amended on reconsideration). Hazen Paper Co. v. Biggins, decided while EEOC v. Local 350 was pending, explicitly left that issue open. See Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993). In EEOC v. Local 350, we further held that a plaintiff need not use the words "disparate impact" in order to state a claim in the complaint that is cognizable using such a theory.[2] See EEOC v. Local 350, 998 F.2d at 648 n. 2. Rather, we held that a complaint that identifies a company policy that falls more harshly on one group than another is "cognizable as a disparate impact challenge." Id. Examining the pleadings in that case, we said "[t]he EEOC does not specify in its pleadings or briefs on appeal whether it is proceeding under a disparate treatment or disparate impact theory of discrimination. Because in this circuit a plaintiff may challenge age discrimination under a disparate impact analysis, both theories were potentially available to the EEOC." Id.
 
 
 87
 In Arnett v. California Public Employees Retirement System, 179 F.3d 690, 697 (9th Cir. 1999), vacated and remanded on other grounds, _______ U.S. _______, 120 S.Ct. 930 (2000), we reaffirmed that plaintiffs may bring suit using a "disparate impact" theory under the ADEA.[3] We were asked whether an individual who challenges an employment policy whose consequences "fall more harshly" on those in the protected class states a claim of disparate impact under the ADEA; we answered in the affirmative. Id. at 692. In Arnett, we reinstated a disparate impact claim after the district court granted a motion to dismiss the plaintiffs' complaint because we found plaintiffs' allegations sufficient to survive dismissal at the pleadings stage. Id. at 693. While plaintiffs had amended their complaint to state the impact claim explicitly, we focused on the adequacy of the pleading as a whole, not on the use of the words "disparate impact." Id.
 
 
 88
 Rather than confronting and relying on our own precedent, the majority turns to a third circuit case, Josey v. Hollingsworth Corporation, 996 F.2d 632 (3d Cir. 1993), which has facts very different from those in our case. In Josey, the Third Circuit held that the plaintiffs had not provided notice of their disparate impact claim when they raised it only after the close of discovery. See id. at 641-2. However, in that case the original complaint did not identify a specific employment practice that had a disparate impact. See id. at 642. Here, the plaintiffs' claims are grounded in a challenge to the termination policies of Quaker in the context of its downsizing; the claims were therefore always directed at the impact of a facially neutral policy. Furthermore, in this case, unlike in Josey, the plaintiffs did give notice, both in the wording of the complaint and by the discovery they conducted, including the resulting statistical evidence they put forward.
 
 
 89
 Even under the erroneous standard that the majority adopts, the plaintiffs in this case sufficiently stated a claim of disparate impact in their complaints. The in artful language in the complaints uses neither "disparate treatment" nor "disparate impact" to describe the allegations against Quaker. Instead, they use the phrase "discrimination under the ADEA" to describe their claims. Since a plaintiff may prove discrimination using either theory, the complaint was sufficient to state both a disparate treatment and a disparate impact claim. Further, the complaint language that described Quaker's "practices," "policies" and "procedures" as discriminatory applies more aptly to impact than to treatment. No amendment of the complaint was required to allow the plaintiffs to prove their claim using a disparate impact approach. The district court considered the disparate treatment claims based on this generic language; it likewise should have considered the disparate impact claims.
 
 
 90
 Furthermore, the majority's argument that Quaker did not have notice of the disparate impact claims fails to recognize that all of the evidence of impact was in the company's hands and under its control. The discovery of the statistical evidence that suggests disparate impact was extensive and gave sufficient notice to Quaker of the disparate impact approach. This is especially true because statistics, while admissible to prove a disparate treatment claim, usually are unnecessary. Disparate impact claims, on the other hand, rely heavily and usually necessarily on statistics. In short, the extensive statistical discovery in this case surely placed Quaker on notice of plaintiffs' impact theory. Any claim to the contrary is disingenuous.
 
 
 91
 Even if we were to take a very narrow view and conclude that there was no notice to Quaker of the disparate impact claim until the summer of 1998 when that claim was fully briefed and plaintiffs moved for summary judgment on the claim, that was time enough. All of the relevant data was in Quaker's possession. Considerable time remained for Quaker to prepare its defense. No trial date had yet been set. The judge took nine months to determine the outcome of the summary judgment motions.
 
 
 92
 The majority errs in adopting a standard that conflicts with our prior precedent. Even under the standard adopted by the majority, we should remand each of these cases to the district court to analyze whether the evidence is adequate to go to trial on the impact theory.
 
 
 
 Notes:
 
 
 [1]
 See majority opinion at 14932-33, providing examples of the findings and characterizing the statistical disparities as "striking"; id. at 14936, explaining that the plaintiffs' statistics demonstrated that employees over 40 received significantly lower rankings on average than those under 40.
 
 
 [2]
 This holding was foreshadowed by Cotton v. City of Alameda, 812 F.2d 1245, 1247 (9th Cir. 1987), where we allowed a liberal construction of an ADEA claim as both a disparate treatment and a disparate impact claim, and by Palmer v. United States, 794 F.2d 534, 538 (9th Cir. 1986), where we allowed a claim that "did not specifically allege discrimination under the disparate impact theory" to go forward based on the notice provided by attachments to the complaint. In Palmer , the district court had determined that statistical studies attached to the complaint that strongly suggested a discriminatory impact constituted notice of an impact claim. Id.
 Similarly, in the Title VII context, we have construed complaints that simply challenged discriminatory policies and practices without specifying the theory under which they were proceeding as disparate impact claims. Golden v. Local 55 of the International Association of Firefighters, 633 F.2d 817, 821 (9th Cir. 1980).
 
 
 [3]
 We reaffirmed the Arnett holding in a recent opinion. In Frank v. United Airlines, Inc., 216 F.3d 845, 856 (9th Cir. 2000), we explained that the Arnett opinion "squarely decided that a disparate impact claim is cognizable in an ADEA case." We affirmed that this holding was not rejected by the Supreme Court when it vacated Arnett in light of Kimel v. Florida Bd. of Regents, 528 U.S. 62, 120 S.Ct. 631 (2000). The Kimel Court held that ADEA does not abrogate the Eleventh Amendment. As we explained in Frank, "The Eleventh Amendment issue is irrelevant to a case, such as this one, in which a private rather than state entity is a defendant, and the Court's vacation of our decision has no bearing on the correctness of our conclusions that a disparate impact claim is cognizable under the ADEA. We see no reason to depart from our conclusion in Arnett and we again hold that a disparate impact claim is cognizable under the ADEA." Frank, 216 F.3d at 856.