Margaret O. **TUNNEL**, Plaintiff,

v.

Donald E. **POWELL**, Chairman, **Federal Deposit Insurance Corporation**, Defendant.

No. C 01–3057 MHP.

United States District Court, N.D. California.

Aug. 16, 2002.

Mary Dryovage, Law Offices of Mary Dryovage, San Francisco, CA, for Plaintiff.

Thomas J. Feeney, Federal Deposit Insurance Corporation, Legal Division, Washington, DC, Suzanne G. Ramos, U.S. Attorney's Office, San Francisco, CA, for Defendants.

## MEMORANDUM & ORDER RE SUMMARY JUDGMENT

PATEL, Chief Judge.

Plaintiff Margaret O. Tunnell brings this action against defendant Donald E. Powell, Chairman of the Federal Deposit Insurance Corporation ("FDIC"), alleging employment discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16 *et seq.* Now before the court is defendant's motion for summary judgment. After having considered the parties' arguments and submissions, and for the reasons set forth below, the court rules as follows.

## BACKGROUND

### I.  General Background

The FDIC is a government-owned corporation responsible for insuring deposits in the nation's banks and thrift institutions. *See generally* 12 U.S.C. §§ 1811, 1821. When an FDIC-insured institution fails, the FDIC pays the insured depositors, disposes of the institution's assets, and settles its accounts. *Id.* The Department of Supervision ("DOS"), an organization within the FDIC, regulates insured institutions to ensure that they operate in a "safe and sound" manner. Ramos Dec., Exh. B. When problems arise at FDIC-insured institutions, DOS may propose a range of enforcement options. *Id.*

Plaintiff Margaret Tunnell, a Caucasian female, has been employed by the FDIC on two occasions. JSUF ¶ 37. Tunnell first joined the FDIC in 1970 as a Bank Examiner Trainee and worked until 1976, when she took a leave of absence to pursue an M.B.A. degree. *Id.* Tunnell did not return from her leave of absence and resigned her position in 1977. Fifteen years later in February 1992, Tunnell was hired by the DOS San Francisco Region as a Grade 11 Bank Examiner, the position she held when she left the FDIC in the 1970s.

Ramos Dec., Exh. C. Tunnell is still currently employed with the FDIC. JSUF ¶ 1. Upon her return, Tunnell was required to retake a written test that other employees did not take upon returning from work in the private sector. *Id.* ¶¶ 30–31. The FDIC explains that Tunnell was required to take the test because she was absent from the FDIC for fifteen years before returning. Def.'s Reply at 9, fn. 8.

Tunnell was promoted three times between 1992 and 1995. In November 1992, she was promoted to a Grade 12 position as Bank Examiner. A year and half later in May 1994, Tunnell became a Review Examiner, a Grade 13 position, and in May 1995 was promoted to Grade 14. Ramos. Dec., Exh. C. It is undisputed that Tunnell has been a valuable employee to the FDIC; that she received several awards; that her supervisors have spoken highly of her; and that she has received excellent evaluations. Def.'s Mot. at 4:17–20; JSUF ¶ 16.

## II. *The 1997 Vacancies*

In 1997, the FDIC announced three vacancies for Grade 15 positions: two for Senior Case Manager and one for Assistant Regional Director. Ramos Dec., Exhs. E.1 & F.1. Tunnell, then in a Grade 14 position, applied for all three vacancies. JSUF ¶¶ 6 & 8. Her application was one of fifteen for the two Senior Case Manager positions and one of seventeen for the Assistant Regional Director. Ramos Dec., Exhs. E.3 & F.3. These positions are highly coveted and draw a well-qualified and competitive applicant pool. Ramos Dec., Exh. O at ¶ 18.

The selection process for these positions involved a number of steps. Ramos Dec., Exh. W. & Exh. D at 6–11; JSUF ¶ 45. First, each application was reviewed to determine if the applicant met the qualifications for the position. JSUF ¶ 45. Second, a separate "rating and ranking" panel reviewed each application and ranked the applicants. *Id.* The panel consisted of one person from the DOS San Francisco Region, one from the DOS Washington office, and another FDIC employee from a division other than DOS. *Id.* Applicants who already held Grade 15 positions and were seeking lateral transfers were not required to go through the paneling process. Ramos Dec., Exh. W at ¶¶ 1–4 B & 1–4 H. The panel compiled a "Roster of Eligibles", also known as the "Best Qualified List", for the vacancies. JSUF ¶ 45. The names were listed in alphabetical order instead of by rank and were passed on to the Deputy Regional Director along with the names of those seeking a lateral transfer.[1] *Id.*

Third, Susan Carroll, the San Francisco Deputy Regional Director, received the Roster of Eligibles and the list of transfers and scheduled interviews with the applicants. *Id.* The interviews were generally conducted by Carroll and the Assistant Regional Directors. Ramos Dec., Exh. H at 3–5. No one who sat on the rankings and rating panel participated in the interviews. Ramos Dec. Exh. D at 6–11. At the conclusion of the interviews, Carroll solicited from each Assistant Regional Director the top two or three candidates for each position. Ramos Dec., Exh. H at 3. Fourth, Carroll met with her superior, Regional Director George Masa to review the applications and determine which candidates to recommend to DOS Washington Office. *Id.* As the final step in the selection process, Simona Frank, DOS Associate Director in Washington, reviewed Carroll

---

1. Lateral transfers are not required to go through the paneling process. Ramos Dec., Exh. W ¶¶ 1–4H.

and Masa's recommendations and made the selections for the three vacancies. *Id.*

Tunnell made it through the first three steps of the selection process. She met the minimum requirements for the position, was ranked by the panel, and interviewed with Assistant Regional Managers. JSUF ¶ 47. The panel ranked Tunnell eighth out of thirteen applicants for the Assistant Regional Director position and ninth out of twelve applicants for the Senior Case Manager positions.[2] Tunnell was the only female on the "Roster of Eligibles" for the Senior Case Manager position. JSUF ¶ 6. Only one other woman applied for the Senior Case Manager position. Ramos Dec., Exh. E.3 at 1–2. Three other women applied for the Assistant Regional Manager position, Ramos Dec., Exh. F.3 at 1–2, two of whom were also on the Roster of Eligibles with Tunnell. Ramos Dec., Exh. F.5 at 1–2. None of the Assistant Regional Directors who conducted the interviews ranked Tunnell among the top two or three candidates for either position. Ramos Dec., Ex. J, vol. 1, at 66, 72. Nor did Carroll recommend to Masa that Tunnell's name be sent to Washington. Ramos Dec. Exh. H at 3.

Masa sent six names to Simona Frank in DOS Washington. *Id.* at 4. Tunnell was not recommended. *Id.* The applicants included four men and two women and four Caucasians and two minorities. Frank selected Vanessa Villalba (Latina) for the Assistant Regional Director position and Louis Cheng (Asian male) and David Promani (Caucasian male) for the Senior Case Manager positions. JSUF ¶ 48.

### III. *The 1999 Vacancy*

In 1999, the FDIC announced a vacancy for an Assistant Regional Director position in the DOS San Francisco Region. Ramos Dec. Exh. G.3. The position became available after Villalba, who was a lateral transfer from Boston in 1997, left the position. The FDIC employed the same procedure as in 1997 to fill this vacancy. Ramos Dec., Exh. H at 5. There were twenty-five applicants for this position, including Tunnell. JSUF ¶ 49.

Tunnell was ranked second by the ratings and ranking panel and was one of seven candidates on the Roster of Eligibles. Ramos Dec., Exh. G.4. A total of sixteen candidates interviewed for this position: the seven ranked candidates and the nine lateral candidates who already held Grade 15 positions. *Id.* ¶ 50. Carroll solicited recommendations from the Assistant Regional Directors and once again Tunnell was not listed in the top group of candidates. Ramos Dec., Exh. I. At 4. Carroll recommended four employees to fill the position: three males and one female; three Caucasians and one minority. Ramos Dec., Exh. G.4. Tunnell was not recommended. Ramos Dec. Exh. J, vol. 1 at 69–70. Frank Hartigan, a white male and lateral transfer, was Carroll's top choice. *Id.* Regional Director Masa concurred with Caroll's recommendation and sent a list of names to Washington with a recommendation to hire Hartigan. JSUF ¶ 52. In Washington, DOS Associate Director Simona Frank approved Hartigan's selection as Assistant Regional Manager. *Id.* ¶¶ 50–51.

At the time of the selections for the 1997 and 1999 vacancies, the FDIC had no re-

---

**2.** Tunnell was actually ranked 8/9/10 out of twelve for the Assistant Regional Director position. Ramos Dec., Exh. F.4 at 1. The disparity between the number of applicants for the positions and the number of applicants ranked by the panel is a result of the transfer applicants—those applicants who already held Grade 15 positions—who were not required to be ranked by the panel.

quirement *to maintain personal hand-written interview notes or other personal notes in its merit promotion files. Id.* ¶¶ 21–22. If any such notes existed, they were discarded shortly after the selections were made. *Id.*

### IV. *Tunnell's Evaluations*

The parties agree that Tunnell is a valued and exceptional employee. In the year prior to the 1998 selection, Tunnell's performance was rated as "Outstanding," the highest summary performance rating, whereas Villalba, Promani and Cheng (those selected for the 1997 vacancies) were rated as "Superior," the second-highest rating. JSUF ¶¶ 34–35. Prior to selection, Tunnell, Promani and Cheng were all performing the same duties as Grade 14 Case Managers in the San Francisco Regional Office. *Id.* ¶ 19. FDIC Deputy Regional Director Carroll added comments to Tunnell's 1996–97 performance review that included the following statement:

> As this rating clearly indicate[s], Ms. Tunnell is an exceptional case manager. She regularly displays her strong technical skills and knowledge in handling the complexities of her portfolio ... Ms. Tunnell's work during this year on the transition from case manager is worthy of special note and appreciation ... Ms. Tunnell's all-round strengths show that she is capable and ready for further advancement.

JSUF ¶ 16.

### V. *Tunnell's EEO Complaints*

After failing to be selected for any of the three vacant positions in 1997, Tunnell filed a timely administrative complaint alleging discrimination based on race and sex. Ramos Dec., Exh. U. Tunnell alleged three separate claims of discrimination: (1) that she was discriminated against on the basis of her race when Villalba (a Latina female) was hired for the Associate Regional Director position; (2) that she

was discriminated against on the basis of her sex when Promani (a Caucasian male) was selected for the Senior Case Manager position; and (3) that she was discriminated against on the basis of her race *and* sex when Cheng (an Asian male) was selected for the Senior Case Manager position. *Id.*

When Tunnell was not selected for the Assistant Regional Manager position in 1999, she filed another Equal Employment Opportunity ("EEO") complaint alleging that she was discriminated against on the basis of her sex and that she was not promoted as retaliation for filing her 1998 EEO complaint. Ramos Dec., Exh. V. The parties agree Tunnell filed two timely EEO complaints; that she exhausted her administrative remedies; and that her court complaint was timely. JSUF ¶¶ 2–3.

The court heard oral argument on FDIC's motion for summary judgement on June 24, 2002. Noting the paucity of citations to evidence in Tunnell's opposition, the court ordered Tunnell to submit a supplemental memorandum listing each argument in her opposition and the evidence in the record corresponding to each argument. The court instructed Tunnell not to submit any new argument. In spite of this, Tunnell's memorandum includes new argument. Consequently, the court granted FDIC leave to file a reply.

### *LEGAL STANDARD*

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.

*Id.* The moving party for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the non-moving party's case." *Id.*

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. *Id.; see also Gasaway v. Northwestern Mut. Life Ins. Co.,* 26 F.3d 957, 960 (9th Cir.1994). Nor is it sufficient for the opposing party simply to raise issues as to the credibility of the moving party's evidence. *See National Union Fire Ins. Co. v. Argonaut Ins. Co.,* 701 F.2d 95, 97 (9th Cir.1983). If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548.

On motion for summary judgment, the court does not make credibility determinations, for "the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505. Inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *See Masson v. New Yorker Magazine,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

*DISCUSSION*

Tunnell claims that she was discriminated against as a white woman in the selections to fill the 1997 and 1999 vacancies. Tunnell also alleges that she was not selected for the Assistant Regional Manager position in 1999 in retaliation for filing an EEO complaint in 1998.

*I. Discrimination Claims*

▆ Discriminatory treatment occurs when the relevant decision makers treat an employee less favorably because of her race or sex. *See United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Tunnell must first establish a *prima facie* case of discriminatory treatment. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Tunnell may establish a *prima facie* case by showing that (1) she is a member of a protected class; (2) she was qualified for the positions in question; (3) that she was denied the positions; and (4) the positions were filled by similarly situated persons outside the protected class. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Once a *prima facie* case has been established, defendant must articulate a legitimate, non-discriminatory reason for its actions. *Chuang v. Univ. of California Davis, Bd. of Trustees,* 225 F.3d 1115, 1123–24 (9th Cir.2000). If defendant does so, Tunnell must produce evidence that the defendant's articulated reasons are pretextual. *See Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1282 (9th Cir.2000).[3]

---

**3.** Tunnell contends that if she has produced "direct evidence" of discriminatory treatment, summary judgment is not appropriate. Pl.'s Opp at 6–7. While this may be true, it is irrelevant, since Tunnell has provided no direct evidence of discriminatory treatment. As Tunnell points out, the Supreme Court, in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), held that whether summary judg-

### A. *Prima Facie Case*

Defendant concedes that Tunnell meets the first three prongs of the *McDonnell Douglas* test. Tunnell is Caucasian and a woman, she was qualified for the four positions at issue, and she was denied those positions. Def.'s Mot. at 12:5–7. The parties do not agree on whether Tunnell has produced sufficient evidence to meet the fourth prong, namely, that the positions were filled by similarly situated persons outside the protected class.

The parties' disagreement stems from the ambiguity concerning which similarly situated persons fall outside of Tunnell's protected class. The problem is definitional. Tunnell variously describes herself as a member of the class of women, the class of Caucasians, *and* the class of Caucasian women. Ramos Dec., Exh. U. (Tunnell's 1998 EEO complaint, alleging discrimination based on race alone, based on sex alone, and based on race *and* sex); Ramos Dec., Exh. V. (Tunnell's 2000 EEO complaint, alleging retaliation for her previous complaint and discrimination based only on sex).[4] Tunnell claims that she was not hired for four positions: two Senior Case Manager positions in 1997 and the Assistant Regional Director position in 1997 and 1999. Those positions were filled, respectively, by a white male, an Asian male, a Latina female, and a white male.

The persons similarly situated to Tunnell are those persons who were interviewed for the vacancies, both Grade 15 laterals and those on the Roster of Eligibles. The evidence is uncontroverted that whites and women were selected for the positions for which Tunnell believes she sustained discrimination. To the extent that she claims discrimination based on either sex or race alone, Tunnell has not presented a *prima facie* case of discrimination.

Tunnell's claim based on race and sex is more complex. Though Tunnell never explicitly argues the point, she appears to believe that the FDIC discriminated against white women in particular. She alleges that the FDIC is "hide-bound," Pl.'s Opp. at 2:21, and "a seething cauldron of testosterone," *Id.* at 14:20–21. While one would expect this environment to affect all women regardless of race, Tunnell suggests that an "informal" affirmative action program compensated for discrimination against women of color. *Id.* at 15:6–19. Tunnell argues that, as a result, white women were treated less favorably than all men and all minorities. As evidence of this, Tunnell points to the fact that no white women were selected for any of the four positions for which she applied.[5] This fact may very well satisfy the *prima facie* requirement that the persons hired for the positions—in this case, men and women of color—be outside the protected class.

It is worth noting that Tunnell never identifies exactly which decision makers discriminated against her. Tunnell names the Chairman of FDIC as the defendant. By alleging that FDIC had an "anti-female atmosphere" and a "white women don't count" policy, Tunnell seems to be arguing that everyone involved in the selection process discriminated against her. If this is

---

ment is appropriate in any particular case will depend in part upon "the probative value of the proof that the employer's explanation is false." *Id.* at 148–149, 120 S.Ct. 2097. Since, as discussed below, plaintiff offers nothing rising to the level of "proof" that the FDIC's explanations are pretextual, even under the standard urged by Tunnell, summary judgment is appropriate here.

4. Tunnell also claimed that she was discriminated against based on age, a claim that she abandoned in her court complaint.

5. The Rosters of Eligibles for the four positions included thirty candidates, of which six were women. Ramos Dec., Exhs. E.5, F.5 & G.5

the case, Tunnell is effectively alleging that there was a corporate-wide conspiracy against white women, a claim for which she has provided absolutely no evidence. If she is alleging that the primary administrator in charge of coordinating the selection process, Susan Carroll, discriminated against her, then she is alleging that a white woman discriminated against another white woman on the basis of her race and sex.

### B. *Legitimate Non–Discriminatory Reasons*

Even if Tunnell can successfully present a *prima facie* case, FDIC has clearly articulated legitimate, non-discriminatory reasons for not promoting Tunnell to the positions for which she applied. *See Quaker Oats Co.*, 232 F.3d 1271. FDIC prepared a lengthy affidavit detailing the specific job qualifications of each successful applicant. Ramos Dec., Exh. H:

For example, Louis Cheng, an Asian male who filled the 1997 vacancy for Senior Case Manager, was the resident examiner at one of the largest troubled institutions in the country; was the San Francisco Region's international banking specialist; was a leader in the FDIC's participation in the Interagency Country Exposure Review Committee; and was instrumental in setting up DOS's international unit. *Id.* at 16–17.

David Promani, a white male who filled the other 1997 vacancy for Senior Case Manager, worked in DOS for nineteen years; handled one of the largest savings and loan institutions in the country; and had experience with some of the most complex and problematic banks in the country. *Id.* at 14.

Vanessa Villalba, a Latina who filled the 1997 vacancy for Assistant Regional Director, previously served as Senior Case Manager for three of the largest banks in the country; was a lateral transfer who was already at Grade 15; had extensive international experience; was the international subject matter expert in the New York Region; and coordinated participation in the Federal Reserve's Foreign Banking Organization Program. *Id.* at 6.

Her 1999 replacement, Frank Hartigan, a white male, has a similarly impressive list of qualifications. In addition to being a CPA (which Tunnell is not), Hartigan has an M.B.A. as well as graduate education in banking. He also has extensive experience within the DOS. Ramos Dec., Exh. I at 4–5.

While it is undisputed that Tunnell is also a distinguished employee of the FDIC, Tunnell offers not one piece of evidence in support of her claim that the qualifications of the individuals who were selected are insufficient to justify their selection. Tunnell likewise offers no evidence that suggests that Tunnell should have been promoted in their stead.

### C. *Pretext*

Tunnell attempts to rebut FDIC's proffered non-discriminatory reasons for promoting candidates other than Tunnell by arguing that FDIC's justifications are pretextual. In support of her claims, Tunnell relies on a host of cursory allegations and unsupported arguments, often without citation to the record. Much of the Tunnell's cited evidence is irrelevant and the remainder is insufficient to convince any reasonable juror that Tunnell's failure to be selected for the vacant positions was related to her race and sex.

#### 1. *Tunnell's Experience, Awards and Qualifications*

Tunnell argues that since she was more qualified for the positions than the selectees, FDIC's reasons for not promoting her are pretextual. Tunnell attempts to establish that she was more qualified by

arguing that she received higher performance ratings, more performance awards, and has broader experience than the selectees.

■ Tunnell provides no evidence in support of her argument that her higher ratings demonstrates that the FDIC's proferred reasons are pretextual. Tunnell was rated "Outstanding" in her performance reviews, the highest summary performance rating. JSUF ¶ 34. In contrast, the selectees all were rated as "Superior," the second-highest rating. *Id.* However, none of the job descriptions required a rating of "Outstanding." *See* Ramos Dec., Exhs. E.1 & F.1. Moreover, there is no indication that these ratings somehow create a presumption that one candidate is more qualified than another. Tunnell appears to believe that repeatedly citing her performance rating creates a triable issue of fact as to the selectees' lack of qualifications.

Plaintiff argues that she had more experience than the selectees, especially Cheng. She points out that she has more than twenty-five years of experience in banking, while Cheng has twelve. Tunnell repeatedly alleges that pretext is demonstrated by the fact that the FDIC claims "Cheng's five months as a Resident Examiner in a bank, with little or no authority, exceeds Ms. Tunell's 25 year banking and examining career." Pl.'s Suppl. Mem. at 7:11–13; 7:19–21; Opp'n at 12:10–12.

However, the portion of Carroll's affidavit that Tunnell cites in support of this allegation actually states that Tunnell has no specific experience comparable to Cheng's in his role as a resident examiner. Cheng had been a resident examiner at Wells Fargo, a fifty-billion dollar, troubled institution, and "was relied upon to ensure the safety of this multi-billion institution." Ramos Dec., Exh. H at 16–17. The affidavit noted that this role is among the most important of any in the FDIC. *Id.* at 17. Carroll, while noting that Tunnell has extensive experience in the banking industry, pointed out that Tunnell has no analogous experience. *Id.* As such, Tunnell's claim that the FDIC argues that "Cheng's five months ... exceeds Tunnel's twenty-five years of experience" takes Caroll's statements out of context and is a mischaracterization of the record.

Tunnell also argues that her educational background is superior to Cheng's because she has an MBA from Harvard while Cheng "was working on an MBA from Chaminade Banking School." Pl.'s Suppl. Mem. at 5:9–11. First, this is incorrect; both Tunnell and Cheng received their MBA degrees in 1983. *See* Ramos Dec., Exh. E.7. Second, the fact that Tunnel's degree is from Harvard while Cheng's is from Chaminade does not create a triable issue of fact as to whether the FDIC's reasons for not promoting her are pretextual.[6]

Tunnell's allegation of pretext with respect to Promani is likewise ill-conceived. Tunnell alleges that the FDIC claims that Promani was selected based solely on his tenure. Tunnell's argument mischaraterizes the record. Carroll's affidavit indicates that the FDIC hired Promani based on his entire background, not simply on the basis of his tenure. Ramos Dec., Exh. H at 15–19.

Finally, plaintiff's allegations concerning Hartigan's lack of qualifications have no basis in the record. Tunnell claims that

6. Tunnell's appears to believe that any justification for not promoting a Harvard MBA *must* be pretextual simply by virtue of the name of the university on her diploma. Simply because an institution traces its birth back to 1636—as opposed to the infinitely more reasonable 1701—by no means guarantees its graduates promotions to highly coveted positions within the FDIC.

Hartigan "did not have the background or technical expertise required in the position description" because he had "never held the position of Case Manager or Field Office Supervisor." Pl.'s Suppl. Mem. at 3:10–12. However, the portion of the job description Tunnell cites in support of this allegation demonstrates that no such requirement exists. *See* Ramos Dec., Exh. G.3. Moreover, FDIC's evidence shows that Hartigan's experience and skills more than qualify him for the position in question. Ramos Dec., Exh. I at 4–5. To simply aver, as Tunnell does, that Hartigan was not qualified for the position without providing an iota of proof of this allegation does not create a triable issue of fact.

Plaintiff's general method of "demonstrating" that she is more qualified than the selectees is to refer to a chart, which she created, characterizing the various employees' strengths and weaknesses.[7] Dryovage Dec., Exh. 6 at 37–47. On the face of it, this selective recitation of Tunnell's qualifications presents no triable issue of fact as to whether the selectees were less qualified for the positions. Moreover, the record indicates that all of the selectees were sufficiently qualified for the positions at issue.

It is clear from the record that Tunnell is an exemplary, highly-qualified employee of the FDIC. However, it is also clear that the positions for which Tunnell applied were highly coveted and drew an applicant pool of similarly superior, highly-qualified candidates. *See* Ramos Dec., Exh. O ¶ 18. Tunnell's claims that she has more generalized experience in the banking industry than the selectees and that she received slightly higher ratings than them is not sufficient to demonstrate pretext. The Ninth Circuit has held that in employment discrimination cases, "[t]he question is not whether [the plaintiff] in the abstract had better qualifications than the other candidates. The question is whether the other candidates are more qualified with respect to the criteria that [the defendant] actually employs." *Cotton v. City of Alameda*, 812 F.2d 1245, 1249 (9th Cir.1987). The FDIC, using the above-explained criteria, determined that the selectees, and not Tunnell, were the best candidates for the positions. Moreover, the court does not sit as a "super-personnel department" with plenary authority to review an employer's decisions concerning which employees are best qualified for particular positions. *See Mills v. Health Care Service Corp.*, 171 F.3d 450, 459 (7th Cir.1999); *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 315 (2nd Cir.1997); *Chaffin v. Textron, Inc.*, 861 F.Supp. 972, 977 (E.D.Cal.1994) (quoting *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir.1991)). Accordingly, the court finds that since all the selectees were sufficiently qualified, Tunnell's qualifications do not create a triable issue of fact as to pretext.[8]

2. *The "White Women Don't Count" Policy*

Tunnell argues that the FDIC's reasons are pretextual because of an alleged "white women don't count" policy. According to Tunnell, this "policy" was announced by

---

7. Tunnell also repeatedly cites to her claims in the original Opposition as "proof" of the allegations in her Supplemental Memorandum. *See,e.g.,* Suppl. Mem. at 14:22–23.

8. Tunell also argues that pretext is demonstrated by the fact that the FDIC required her to take a written test upon her return from the private sector, while other "similarly situated" males were not so required. Tunnell offers no evidence that these men were similarly situated, and there is uncontroverted evidence that they were not similarly situated. JSUF ¶ 31 (one employee took a two-grade reduction upon return while the other was absent for only four years, as opposed to Tunnell's return to the same grade after an absence of sixteen years).

Susan Carroll in 1998. Pl.'s Opp. at 15–16. Tunnell completely mischaracterizes Carroll's statement. In response to a question posed as to whether statistics in a report concerning minority hiring prepared by the San Francisco DOS for the FDIC's Washington headquarters included white women, Carroll replied that "white women don't count." Ramos Dec., Ex. J, vol. at 30–33; vol. 2 at 22–24. Carroll was simply explaining, in response to a direct question, that the statistics did not include white women because this one particular report did not segregate statistics for men and women. *Id.* No reasonable juror would believe that this was the announcement of a policy against white women, or that this was even circumstantial evidence of Carroll's state of mind.

Tunnell also points to the alleged name change by the FDIC's Diversity Committee as further evidence of the "white women don't count" policy. The name was allegedly changed from "National Minorities and Women Recruitment Task Force" to "National Minority Recruitment Task Force." How this is relevant to Tunnell's discrimination claim remains unexplained.

### 3. *Lack of a "Qualified" Affirmative Action Program*

Tunnell argues that no "qualified affirmative action program" was in place in 1998. Tunnell fails to explain what constitutes a "qualified" affirmative action program or demonstrate how the alleged lack of an affirmative action program is relevant to Tunnell's claims. Plaintiff claims that "race and sex were used as factors in the promotion," Pl.'s Suppl. Mem. at 14:22–23, but cites only *her own brief* in support of this contention. Indeed, as Tunnell points out, the FDIC does *not* claim that affirmative action goals were used in this promotion decision. *Id.* at 14:25–26. Thus, Tunnell's claim, which appears to assert the existence of a clandestine affirmative action program operating to the exclusion of white women, is baseless.

### 4. *Preselection*

Tunnell argues that the selectees for 1997 Senior Case Manager vacancies were preselected. Specifically, she contends that Cheng was allowed to write the job description for the Senior Case Manager position "to tailor it to fit his unique background."[9] Pl's Opp. at 12:8–9. First, Tunnell's supporting citation directly refutes her claim. Ramos Dec., Exh. Q at 53–54 (deposition of Richard Mayher stating that he had no knowledge of Cheng being involved in drafting the job description). Second, the single case Tunnell cites does not support the proposition that Cheng's alleged actions constitute preselection. In that case, *Yee v. Dept. of Environmental, Services,* 826 F.2d 877 (9th Cir. 1987), a white employee, competing with only one other employee (who was Asian) for a promotion, was allowed to cheat on an oral exam by drafting the exam questions. In this action, Cheng allegedly merely drafted the job description, and there were fifteen applicants for the position. The two situations are simply not analogous.[10] Finally, assuming *arguendo*

9. Tunnell's Opposition actually states the Cheng was allowed to write the "ARD" (Assistant Regional Director) job description, rather than the description for the Senior Case Manager position for which Cheng was actually hired. Since a literal reading of the Opposition would completely strip Tunnell's argument of whatever intelligibility it has, the court will interpret the document liberally and assume that the mistake was a typographical error.

10. It is not clear from the record whether Cheng actually wrote the job description, as Tunnell alleges. Cheng, then Case Manager, sent a memo to Assistant Regional Director Richard Mayher outlining proposed qualifications for applicants for the Senior Case Man-

that this claim is true, it works against Tunnell's allegations of pretext. Such "preselection" could not support any claim of discrimination against white women in particular, since it would put *all* other applicants of *all* ethnicities, male and female alike, at a disadvantage in relation to Cheng. Tunnell's allegation of preselection simply does not give rise to an inference that defendant's articulated reasons for not promoting her are pretextual.

### 5. *Subjectivity of Decision–Making Process*

As evidence of pretext, Tunnell alleges that "[t]he FDIC now claims that she did not do well in the interview, compared with the selectees." Pl.'s Opp at 12:2. Nowhere in the motion does the FDIC make this claim, and Tunnell offers no evidence to support this allegation. Tunnell also alleges that the interview process "was extremely subjective and ignored the objective criteria." Pl.'s Opp. at 12:23. Tunnell offers absolutely no evidence for this claim, and, indeed, this claim is directly controverted by defendant's evidence which shows that all the interviewees were all asked the same structured questions in each interview. Ramos Dec., Exh. H at 3:3–6.

### 6. *Destruction of Interview Notes*

Tunnell repeatedly makes heavy weather of the fact that the interview notes were destroyed after the selection process was completed. Tunnell claims that this practice was "illegal" and announces her intention to seek sanctions against defendant. Pl.'s Opp. at 13:4–16. First, it is undisputed that it was the regular practice of the FDIC to destroy interview notes after all interviews. JSUF ¶ 21. This alone vitiates Tunnell's claim that the destruction of the interview notes goes to pretext. Second, there is no evidence that this procedure was ever illegal.[11] Tunnell's claim that the destruction of interview notes, which was the regular practice of the FDIC after all interviews, somehow gives rise to an inference of pretext is without merit. Moreover, allegations of the intentional destruction of evidence are very serious, and the court notes that Tunnell has made this allegation without any support in either the record or case law.[12]

### 7. *Statistical Evidence*

Tunnell offers statistics which purport to show that the FDIC "belie[ves] that women are less qualified than men." Pl.'s Opp. at 13:23. The statistics fail to support this claim. Tunnell's statistics do not concern the relevant labor pool, i.e., the highly qualified, well-educated individuals who applied for the particular jobs at issue. *See Quaker Oats Co.,* 232 F.3d at 1283. Tunnell's statistics show only a disparity between the percentage of women in the workforce at large and the percentage of women employed by the DOS. Dryovage Dec., Exh. 7–2. Tunnell offers no evidence

ager position for the San Francisco region. Dryovage Dec., Exh. 6–9. The FDIC argues that the memo merely incorporated a description of the position that had been drafted years before. Def.'s Suppl. Reply at 5:4–16.

11. In 2001, the FDIC, as part of a consent decree, agreed to implement a new policy of maintaining interview records after interviews. There was no admission of or finding of liability. *See Conanan v. Tanue,* No. 00–CV–3091 (D.D.C. Consent Decree, approved Nov. 26, 2001). The consent decree was first approved in 2001, well after Tunnell filed her 1999 complaint. The court notes that despite the fact that the FDIC correctly pointed out this timing discrepancy in its Reply, Tunnel realleged the same erroneous claim concerning the FDIC's failure to follow its own policies in her Supplemental Memorandum.

12. The court further notes the irony of Tunnell's counsel's announced intention to bring sanctions against FDIC based upon claims that have no basis in either fact or law.

concerning the percentage of qualified white women who applied for comparable jobs. As such, the statistics she offers have little probative value with respect to her discrimination claims. *See Hagans v. Andrus*, 651 F.2d 622, 627 (9th Cir.1981) (describes evidence of low percentage of women in high-level positions as "meaningless" without evidence of pool of qualified women).

### 8. *Anti–Female Atmosphere*

Tunnel's allegation that the DOS was "a work environment in which women are not valued for their professional contribution," Pl.'s Opp at 15:5–6, is entirely unsupported by the evidence. Tunnell claims that a group of women employees left the San Francisco DOS because of an unspecified "bad situation." *Id.* at 14:21–24. This allegation is unsupported any evidence, and is directly refuted by Tunnell's own admissions to the effect that all the women left for legitimate reasons. Ramos Dec., Exh. T at 115–16. In further support of her claim, Tunnell references a newspaper article which described the DOS as "a seething cauldron of testosterone." Pl.'s Opp. at 14:20–21. This statement is inadmissible heresay and will not be considered by the trier of fact.[13] Fed.R.Evid. 802.

Finally, Tunnell makes reference to the inclusion, "over plaintiff's objections," of a "Bondage Bar–B–Doll" in an office charity auction. *Id.* at 15:2–3. Tunnell claims that this item was placed in the auction by Richard Mayher, who was also supposedly involved in the selection process. *Id.* Tunnell offers no evidence for this claim, and there is uncontradicted testimony in the record that Mayher had no involvement in placing items in the auction. Ramos Dec., Exh. Q at 84–85. Moreover, Tunnell does not explain how this item (apparently donated to the auction by a female employee) is relevant to her claims of an anti-female atmosphere at the DOS. *Id.* It is incumbent upon plaintiff to provide such an explanation, and she has failed to do so.

It is Tunnell's burden, rather than the court's, to identify evidence which gives rise to the inference that the FDIC's proffered reasons for not promoting her are pretextual. "It is not our task... to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonably particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996); *see also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir.2001) (Kleinfeld, J.) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found."). Concerned about the dearth of citation to the record in Tunell's opposition, the court gave Tunnell a final opportunity to provide evidence in support of her claims in the form of a supplemental memorandum. Despite this opportunity, Tunnell has not provided the court with evidence for her allegations.[14]

---

**13.** In any event, medical reports, rather than magazine clippings, would be necessary to support Tunnell's claim that the FDIC is a "seething cauldron of testosterone."

**14.** In fact, the supplemental memorandum repeats many of the mistakes in her initial opposition, and even adds some new ones. For example, she cites as her opposition brief as "evidence." Tunnell also often provides only the most general citations. As an example, Tunnell cites to pages *eight through one-hundred* of her own deposition in support of one particular claim. Pl.'s Suppl. Mem. at 5:23–24. Finally, Tunnell blatantly ignored the court's order to include no additional argument, requiring the expenditure of defendant and the court of additional time, energy and cost.

The court finds that no reasonable juror could infer from the evidence presented that the FDIC's proffered reasons for not hiring Tunnell are pretextual.

## II. *Retaliation Claim*

■ To put forth a *prima facie* case of retaliation, Tunnell must show that (1) she participated in Title VII proceedings; (2) the FDIC subsequently took adverse action against her; and (3) a causal link exists between the protected activity and the adverse action. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1190 (9th Cir. 2002). FDIC concedes that plaintiff satisfies the first two prongs of the test, since she (1) filed an EEO claim in 1998 and (2) was subsequently not hired for the Assistant Regional Director position in 1999. However, defendant argues, and the court agrees, that Tunnell has not shown that there is a causal connection between the two.

Tunnell acknowledges that the managers involved in the promotion decisions all gave legitimate justifications for their decisions. Pl.'s Opp. at 10. Nevertheless, Tunnell argues that a causal link between the EEO complaint and the failure to hire is demonstrated by circumstantial evidence, namely: (1) that plaintiff was more qualified for the job than Hartigan; (2) that Hartigan was preselected; and (3) that the selection procedures put Tunnell at a disadvantage. *Id.*

As to Tunnell's first assertion, as discussed above, there is no question of fact as to whether Hartigan was sufficiently qualified for the job. As to her second assertion, Tunnell presents absolutely no evidence, circumstantial or otherwise, in support of the claim that Hartigan was preselected. Indeed, Tunnell appears to have conflated Hartigan with Cheng in this

respect. *See supra,* at I.C.4. As to Tunnell's final point, she likewise never explains how or why the selection procedures put her at a disadvantage.[15]

■ As a matter of law, plaintiff has not provided evidence sufficient to established a *prima facie* case of retaliation.

Tunnell's action relies almost entirely on unsupported allegations, irrelevant claims, and representations directly contravened by undisputed evidence. Her counsel has baselessly accused the FDIC of destroying evidence, threatened to bring sanctions against defendant, and intimated that the FDIC is engaged in a shadowy conspiracy to prevent Tunnell from being promoted. Tunnell's counsel should ensure, prior to engaging in such *ad hominem* attacks, that the evidence supports her assertions.

## CONCLUSION

For the foregoing reasons, the court GRANTS defendant's motion for summary judgment.

IT IS SO ORDERED.

**15.** Tunnell also claims that retaliation is demonstrated by the fact that the 1999 interview was conducted by the same officials who interview her in 1997. Pl.'s Suppl. Mem. at 4:13–14. Tunnell fails to explain how this constitutes retaliation